2007 UT 15

STATE of Utah, Plaintiff and Petitioner,

v.

Heather Jo RODRIGUEZ, Defendant and Respondent.

No. 20040566.

Supreme Court of Utah.

Jan. 30, 2007.

Rehearing Denied March 28, 2007.

Mark L. Shurtleff, Att'y Gen., Matthew D. Bates, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Shannon N. Romero, Lori Seppi, Salt Lake City, for defendant.

Janice L. Frost, Salt Lake City, for amici Utah Peace officers' Ass'n, Utah Sheriff's Ass'n, Dep't of Public Safety, Statewide Ass'n of Prosecutors.

NEHRING, Justice:

¶ 1 After a fatal traffic accident claimed the life of her passenger, Heather Jo Rodriguez was charged with automobile homicide. The district court denied Ms. Rodriguez's motion to suppress blood-alcohol evidence obtained in a warrantless search following the accident; the court of appeals later reversed. We granted certiorari to answer the narrow question of whether dissipation of alcohol in the blood, without more, created an exigent circumstance under the Fourth Amendment justifying the warrantless extraction of a blood sample from Ms. Rodriguez.

¶ 2 Because we found that it does not, we asked the parties to provide additional briefing on the question of whether the court of appeals correctly held that the totality of the circumstances surrounding Ms. Rodriguez's blood draw failed to create an exigency sufficient to justify a warrantless search. Having now considered both questions, we decline the invitation to assign presumptive exigent status to warrantless blood draws, but we hold that the totality of the circumstances in this case justified the extraction of blood from Ms. Rodriguez without a warrant and therefore reverse the judgment of the court of appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 3 Heather Jo Rodriguez was driving south on Main Street in Salt Lake City with a passenger, Terry Stewart, on May 9, 2001. Between 4:45 and 4:50 p.m., Ms. Rodriguez made an abrupt left turn into the path of an oncoming school bus. The bus broadsided Ms. Rodriguez's car, critically injuring both Ms. Rodriguez and Ms. Stewart. Paramedics arrived on the scene and transported the critically injured Ms. Rodriguez to LDS Hospital. Ms. Stewart sustained severe head injuries and was considered by paramedics to be near death. She had to be extricated from the mangled car and transported to University of Utah Medical Center.

¶ 4 When Salt Lake City police officers arrived to investigate the accident, paramedics were in the process of transporting the women to their respective hospitals. A paramedic told officers that the two women smelled of alcohol. Police officers located Ms. Stewart's purse at the scene. It contained an opened, partially-empty bottle of vodka. A supervising officer then arrived and was informed of the circumstances surrounding the accident. He immediately contacted police dispatch with instructions to send an officer to obtain a blood sample from Ms. Rodriguez that could be tested for alcohol content.

¶ 5 Dispatch directed an officer to the hospital to "witness a blood draw" from the driver. The officer first mistakenly went to the University of Utah Medical Center where he was informed that Ms. Stewart, not Ms. Rodriguez, was being treated.

¶ 6 The officer then drove to LDS Hospital where he located Ms. Rodriguez in the emergency room awaiting a CT scan. He detected evidence of inebriation, including the odor of alcohol on her breath, slurred speech, red eyes, and uncooperative and belligerent behavior.

¶ 7 The officer waited between twenty and twenty-five minutes in the CT room for a technician to arrive and draw Ms. Rodriguez's blood. The blood was taken from an IV line that the hospital staff had previously inserted into Ms. Rodriguez's arm for medical purposes. Later testing revealed that Ms. Rodriguez had a blood-alcohol level of .39, nearly five times the legal limit.

¶ 8 The passenger, Ms. Stewart, died as a result of her injuries. Ms. Rodriguez recovered and was arrested and charged with automobile homicide. Ms. Rodriguez moved to suppress the evidence obtained from the warrantless blood draw. The district court denied her motion. Ms. Rodriguez then pled guilty to the automobile homicide charge, reserving the right to appeal the district court's denial of her motion to suppress the blood evidence.

¶ 9 Before the Utah Court of Appeals, Ms. Rodriguez argued that the district court erred because the State (1) did not demonstrate that the officer had probable cause to believe she had committed an alcohol-related offense and (2) had failed to show that the

warrantless blood draw was justified by exigent circumstances. The court of appeals found that exigent circumstances were not present sufficient to justify a warrantless blood draw and reversed the district court. Because it decided the case on the absence of exigent circumstances, the court of appeals did not reach the issue of probable cause.

¶ 10 In support of its holding, the court of appeals noted that "exigent circumstances will be found, where the situation involves blood-alcohol evidence, only when the totality of the circumstances supports a finding that the officer was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence." *State v. Rodriguez*, 2004 UT App 198, ¶ 14, 93 P.3d 854 (citation and quotation marks omitted). The court of appeals conceded that because the human body metabolizes alcohol, its presence in the bloodstream is transitory. The court concluded, however, that the evanescent nature of blood-alcohol evidence is not sufficient, standing alone, to create an exigent circumstance justifying a warrantless intrusion into the body to take blood. *Id.*

¶ 11 Having declined to assign *per se* exigent status to blood-alcohol tests, the court of appeals looked for the presence of other circumstances which in their totality justified the seizure of Ms. Rodriguez's blood without a warrant. Looking to its own precedents, the court considered

> "the distance to the nearest magistrate, the availability of a telephonic warrant, the feasibility of a stake-out or other form of surveillance while a warrant is being obtained, the seriousness of the underlying alcohol-related offense, the commission of another offense such as fleeing the scene, the ongoing and continuing nature of an investigation, the extent of probable cause, and the conduct of the investigating officers."

*Id.* ¶ 16 (quoting *City of Orem v. Henrie*, 868 P.2d 1384, 1392 (Utah Ct.App.1994)).

¶ 12 The court observed that it was "clear from the record that the decision to extract Rodriguez's blood was made soon after the accident occurred, at a time when courts are open and search warrants can be readily requested either in person or by telephone." *Id.* ¶ 19 (citation and quotation marks omitted). In other words, the State did not consider the feasibility of obtaining an expedited search warrant. The court of appeals found that the State presented no evidence that "anyone, at any time, had assessed the difficulty and time required to obtain a proper search warrant." *Id.*

¶ 13 Drawing largely on the fact that the very concept of a warrant had apparently not entered the consciousness of the police officers conducting the accident investigation, coupled with the fact that the police developed probable cause to believe that Ms. Rodriguez had been consuming alcohol at a time when the courts were open and a search warrant could have easily been requested personally or by telephone, the court of appeals held that the State failed to meet its burden of proving exigency. *Id.* ¶ 20.

¶ 14 In our certiorari review of the court of appeals' decision, we will first explore whether our courts may be freed from assessing the "totality of the circumstances" when faced with a Fourth Amendment challenge to a warrantless blood draw because the presence of alcohol, without more, establishes sufficient justification for the search. We will next turn to whether, in the absence of a presumptive exigency, Ms. Rodriguez's blood draw was nevertheless justified under the totality of the circumstances. We conduct both questions ceding no deference to the court of appeals. The first is a pure question of law. We review anew the second question because it concerns the proper application of constitutional guarantees against unreasonable searches and seizures. *State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699.

## ANALYSIS

### I.  EXIGENT CIRCUMSTANCE

¶ 15 The Fourth Amendment to the United States Constitution ensures "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. Reasonableness is the key to any Fourth Amendment analysis. *See  Pennsylvania  v.*

*Mimms,* 434 U.S. 106, 108–09, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).[1] The protection afforded by the Fourth Amendment is intended to assure each individual that as a nation we prize personal dignity and privacy and will not countenance arbitrary intrusions on those valued interests. The Fourth Amendment mandates a warrant based on probable cause and reviewed by an impartial magistrate as the operational safeguard against arbitrary police intrusions. A search or seizure conducted without the aid of a warrant is *per se* unreasonable. *See, e.g., United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) ("In the ordinary case, the Court has viewed a seizure of personal property as per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.").

■ ¶ 16 A reasonable warrantless search can occur only when the legitimate state interest served by the intrusion outweighs individual interests shielded by the Fourth Amendment. *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). One class of exceptions to the warrant requirement is exigent circumstances. The words "exigent circumstances" suggest the nature of the legitimate state interest to which the exception refers: there must be an urgency to acquire evidence that falls outside the ordinary course of law enforcement. For instance, the completion of tasks associated with obtaining a warrant may place the safety of the police officers or the public at unacceptable risk or result in the destruction of essential evidence necessary to prosecute a crime. *See, e.g., Camara v. Mun. Ct. of San Francisco,* 387 U.S. 523, 534, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (safety of the public); *State v. Larocco,* 794 P.2d 460, 470–71 (Utah 1990) (safety of police and risk of loss of evidence); *State v. Limb,* 581 P.2d 142, 144 (Utah 1978) (risk of loss of evidence).

¶ 17 The United States Supreme Court has assigned presumptive exigent circumstances status to certain classes of limited intrusions. For example, in recognition of the safety risks confronting a police officer who makes a traffic stop, the Supreme Court has authorized officers, without a warrant, to run a background check of a driver and passengers and, in addition, to order a driver and passengers out of the vehicle. *See, e.g., Maryland v. Wilson,* 519 U.S. 408, 410, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (noting that officers may order a passenger out of the vehicle); *United States v. Holt,* 264 F.3d 1215, 1221 (10th Cir.2001) (noting that officers may run a background check of vehicle occupants for their own safety).

■ ¶ 18 The State contends that there is a recognized general exigency of evidence destruction which applies to warrantless blood draws. Had the United States Supreme Court held that the Fourth Amendment permits police to conduct a warrantless blood draw whenever evidence of alcohol is present, the task before us would be easy. However, the fact that it has not so held places us in the position of following a course that is part divination and part pragmatism.

¶ 19 We engage in divination when, employing what we might ambitiously call a principled approach to prophecy, we attempt to predict how the United States Supreme Court might decide the question before us. This is a perilous activity. As we will see when we take up the clearest pronouncement of the Supreme Court on the issue of alcohol and warrants, the Supreme Court could have created forty years ago the very categorical exigent circumstance rule for alcohol that the State now seeks. But it did not. We are not easily convinced that the Supreme Court has changed its mind on this question and merely awaits the appearance of the case that will permit it to make its intentions known to all.

¶ 20 Any discussion of exigency and blood-alcohol evidence takes place on terrain covered by the long shadow cast by *Schmerber*

---

1. Article I, section 14 of the Utah Constitution likewise guarantees the citizens of our state freedom from unreasonable searches and seizures. We have, however, not been invited to take up the question presented under the Utah Constitution. We therefore once again postpone an analysis of the substantive differences, if any, between the respective search and seizure provisions of the United States and Utah Constitutions.

*v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Several of *Schmerber's* most important facts are replayed in the events here. Mr. Schmerber and his friend had been drinking at a tavern. The two individuals left the tavern in an automobile driven by Mr. Schmerber. The auto crossed the road, skidded, and struck a tree. Both Mr. Schmerber and his passenger were injured and taken to a hospital for treatment. Believing alcohol contributed to the accident, a police officer arrested Mr. Schmerber and directed a physician to draw a sample of his blood. The officer did not obtain a warrant. *Id.* at 758 n. 2, 86 S.Ct. 1826.

¶ 21 Presented with these facts, the Court· first concluded that warrantless searches involving intrusions into the human body implicate the Fourth Amendment. *Id.* at 767–68, 86 S.Ct. 1826. The Court then found in such cases that "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Id.* at 768, 86 S.Ct. 1826. The Court thus rejected the notion that bodily intrusions undertaken to obtain evidence were categorically unreasonable under the Fourth Amendment and concluded that the state could penetrate a person's body to obtain evidence under certain circumstances. The challenge lay in identifying what those circumstances were.

¶ 22 The Court was satisfied that the police officer had probable cause to arrest Mr. Schmerber, but also noted that the probable cause sufficient to effect an arrest was not the same probable cause necessary to conduct a search of a person's body. This is because probable cause to conduct a search involves a concept foreign to the probable cause required to justify an arrest: the expectation of privacy.

¶ 23 The concept of "expectation of privacy" features prominently in the vocabulary of the Fourth Amendment. It functions as a tool to gauge the reasonableness of a search. The *Schmerber* Court acknowledged that the interest that poses the most substantial countervailing force to a community's interest in effective law enforcement is the dignity and integrity of the human body. Justice Brennan later explained *Schmerber* in these terms: "[t]he intrusion perhaps implicated *Schmerber's* most personal and deep-rooted expectations of privacy, and the Court recognized that Fourth Amendment analysis thus required a discerning inquiry into the facts and circumstances to determine whether the intrusion was justifiable." *Winston v. Lee,* 470 U.S. 753, 760, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985).

¶ 24 The heightened expectation of privacy associated with the human body meant that probable cause to conduct a body search had to be grounded on something more than mere suspicion. Rather, sufficient probable cause was present only where there was a "clear indication that ... evidence will be found." *Id.* at 762, 105 S.Ct. 1611 (citation and quotation marks omitted).

¶ 25 The significance assigned to the elevated expectation of privacy for one's body not only led the Court to impose a more rigorous standard for probable cause, but also prompted the Court to emphasize the importance of acquiring a warrant in advance of conducting a bodily intrusion. As the Court stated in *Schmerber* and reiterated in *Winston:*

> "Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned.... The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great."

*Winston,* 470 U.S. at 761, 105 S.Ct. 1611 (quoting *Schmerber,* 384 U.S. at 770, 86 S.Ct. 1826).

¶ 26 The State holds the view that the reverse is true. The State argues that drawing blood is a significantly lesser intrusion into a person's privacy than an intrusion into a home, automobile, or non-invasive body search. This assertion misunderstands the privacy inquiry. Invasive body searches implicate the most "personal and deep-rooted" expectations of privacy, a privacy which is

not present in searches of homes, automobiles, or clothing. *Id.* at 760, 86 S.Ct. 1826.

¶ 27 That a blood draw is a minor matter in the realm of invasive procedures and one that is commonly performed does not alter the fact that it is an invasion of the human body and subject to a heightened expectation of privacy. *Id.* at 762, 86 S.Ct. 1826 ("The blood test procedure has become routine in our everyday life."). Justice Marshall explained this point in his dissent in *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 644, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). There, Justice Marshall reminds the Court that *Schmerber* does not teach that blood draws do not infringe significant privacy interests merely because they have become commonplace. The commonness, comfort, and safety of Mr. Schmerber's blood draw became relevant "only *after* [the Court] established that the blood test fell within the 'exigent circumstances' exception to the warrant requirement, *and* established that the test was supported by probable cause." *Skinner*, 489 U.S. at 645 n. 7, 109 S.Ct. 1402 (emphasis in original).

¶ 28 We are careful to note that, although Mr. Schmerber was under arrest at the time his blood was drawn and the Court characterized the blood draw as "an appropriate incident to [defendant's] arrest," the Court took pains to note that "the mere fact of a lawful arrest does not end our inquiry." *Schmerber*, 384 U.S. at 769, 771, 86 S.Ct. 1826.[2] The *Schmerber* Court understandably concluded that searches directed at safeguarding arresting officers "have little applicability with respect to searches involving intrusions beyond the body's surface." *Id.* at 769, 86 S.Ct. 1826.

¶ 29 The Court then turned its attention to the absence of a warrant. It concluded that the officers acted lawfully when they obtained the defendant's blood without a warrant because blood-alcohol content begins to drop shortly after drinking ends, time had been taken to transport the defendant to a hospital and to investigate the accident scene, and the necessity to seek out a magistrate and secure a warrant would require even more time. *Id.* at 770–71, 86 S.Ct. 1826.

¶ 30 Contrary to the assertion of the State, *Schmerber* does not stand for the proposition that the loss of evidence of a person's blood-alcohol level through the dissipation of alcohol from the body was a sufficient exigency to justify a warrantless blood draw. Rather, these three categories of "special facts" combined to create the exigency. The evanescence of blood-alcohol was never special enough to create an exigent circumstance by itself.

¶ 31 The guarded language employed by Justice Brennan to define the Court's holding in *Schmerber* reinforces our conclusion that the Court did not intend a categorical recognition of blood-alcohol exigency. Justice Brennan stated "[t]hat we today hold that the Constitution does not forbid the States' minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." *Id.* at 772, 86 S.Ct. 1826. We can uncover no endorsement of a per se rule in this statement of the *Schmerber* holding.

¶ 32 The Court confronted a more substantial intrusion in *Winston*, 470 U.S. 753, 105 S.Ct. 1611. There, the Commonwealth of Virginia sought to compel a robbery suspect to undergo surgery to remove a bullet lodged in his chest. The Court held that such surgery would be an unreasonable search under the Fourth Amendment both because extracting the bullet would intrude substantially on the suspect's privacy and security interests and because the state had failed to demonstrate a compelling need for the bullet.

**2.** The Court apparently did not intend to ascribe legal significance to its "incident to arrest" labeling of the *Schmerber* blood draw. In *Winston v. Lee,* the Court noted that *Schmerber* "fell within the exigent circumstances exception to the warrant requirement." 470 U.S. at 759, 105 S.Ct. 1611. The Court's use of the "search incident to arrest" justification for the warrantless search in *Schmerber* has spawned considerable debate over whether an actual arrest must precede a warrantless blood draw or whether a showing of probable cause for arrest will suffice. *See State v. Blank,* 90 P.3d 156, 161, 163 n. 41 (Ala.2004) (listing jurisdictions that have adopted categorical exigent circumstances rule). Here, the State has advanced the sole argument that the blood draw was justified under the exigent circumstance rationale.

The Court noted that in cases of intrusions below the skin, *Schmerber* required that several considerations be accounted for before the interests of an individual would yield to the state's interest in prosecuting a crime: (1) officials must have probable cause for the search, (2) the procedure used must be reasonable, and (3) there must be minimal intrusion upon the person's personal privacy and bodily integrity. *Winston*, 470 U.S. at 761–62, 105 S.Ct. 1611.

¶ 33 It is true that the *Winston* Court emphasized *Schmerber's* characterization of blood tests as minimally intrusive, in contrast to the surgical removal of the bullet from Mr. Winston. *Id.*, 470 U.S. at 761–62, 105 S.Ct. 1611. The Court also reaffirmed the reasonableness of blood draws, holding that a state's interest in proving alcohol impairment to enforce its drunk driving laws "was sufficient to justify the intrusion, and the compelled blood test was thus 'reasonable' for Fourth Amendment purposes." *Id.* at 763, 105 S.Ct. 1611.

¶ 34 However, *Winston* involved a unique factual situation. The Court's holding demonstrates its continued adherence to the core elements of *Schmerber*. *Id.* at 761–62, 86 S.Ct. 1826. *Winston* did not, and because no blood draw was involved could not, announce that warrantless blood draws to measure alcohol content were per se justified under the exigent circumstances doctrine.

¶ 35 Although the State takes pains to provide a roster of lower federal and state courts that have found that the temporary presence of alcohol in the blood creates sufficient urgency to justify a warrantless blood-alcohol test, in none of these cases was exigency established by the presence of alcohol alone. Rather, either exigency was not at issue or the court pointed to delays in the warrant acquisition process as circumstances that would suffice to create an exigency.

¶ 36 Two of the cases cited by the State come close to ceding alcohol per se exigency status: *State v. Cocio*, 147 Ariz. 277, 709 P.2d 1336 (1985), and *State v. Bohling*, 173 Wis.2d 529, 494 N.W.2d 399 (1993). We read *Cocio*, however, as allowing the police to obtain, without a warrant, a portion of blood that has already been drawn from the body for other valid medical reasons. The intrusion was not, then, a governmental act. For its part, *Bohling* allowed a warrantless blood draw solely for the purpose of determining blood-alcohol incident to arrest—a state of affairs which we are not faced with today. *Bohling* also rested its conclusion that alcohol has obtained per se exigency status on several points with which we cannot agree. These include what we consider to be a flawed reading of *Schmerber*, 384 U.S. 757, 86 S.Ct. 1826, and a misapplication of *Skinner*—a point highlighted by the *Bohling* dissent.[3] Furthermore, we find ourselves in agreement with the three justices of the *Bohling* dissent who concluded, "The legislative intent behind the telephonic warrant procedure is to encourage use of warrants and minimize resort to warrantless searches when circumstances might otherwise be exigent." *Bohling*, 494 N.W.2d at 408 n. 7 (citing *United States v. Talkington*, 843 F.2d 1041, 1046–47 (7th Cir. 1988) (citing 1977 Amendment to Federal Rule 41, advisory committee notes)).

¶ 37 We are wary of embracing holdings from other state courts that have applied the Fourth Amendment to warrantless blood-alcohol tests for a more fundamental reason. The premise that fuels the State's claim to per se exigency status for blood-alcohol tests is that owing to the evanescent quality of blood-alcohol evidence, the delays that ac-

---

**3.** *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 623, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), does not establish, as the Wisconsin court asserts, that exigent circumstances are present whenever public safety is furthered through procurement of a blood sample. *Skinner* approved federal regulations mandating warrantless blood and urine tests of railroad employees following rail accidents. The decision was not based, however, on principles applicable to the investigation of crimes.

The Court emphasized that the usual warrant and individualized suspicion rules in criminal cases were inapplicable to the administrative testing of railroad employees because the testing of railroad employees was not mandated to assist in the prosecution of employees but rather to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs.

*State v. Bohling*, 173 Wis.2d 529, 494 N.W.2d 399, 408 n. 9 (1993) (Abrahamson, J., dissenting) (quotation marks omitted).

company the acquisition of a warrant threaten to place useful evidence beyond the reach of law enforcement. The State assumes, without evidence or authority, that the attempt to obtain a warrant where blood-alcohol evidence is sought will always be accompanied by unacceptable delay. But what if a warrant can be obtained expeditiously? We believe that there is substantial reason to believe this is possible.

¶ 38 The rules for obtaining a warrant include a minimum of universally applicable standards: the warrant must be "upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Fourth Amendment leaves to others the details of how to go about obtaining a warrant. The astonishing advances that have marked communications and information technology over recent decades have dramatically pared back the physical obstacles to warrant acquisition.

¶ 39 Court rules and legislative enactments sometimes keep pace with this technology. Sometimes they do not. Prior to 1980, a peace officer or prosecuting attorney would be required to obtain the physical presence of a magistrate so that she might examine the complainant, take written depositions (affidavits), and sign the warrant. Utah Code Ann. § 77–54–4 (1978). This would obviously take an unacceptable amount of time in many cases. In *State v. Jasso,* 21 Utah 2d 24, 439 P.2d 844 (1968), we suppressed evidence where an Ogden police officer personally applied to a judge for a search warrant at his residence late at night. The judge was of the opinion that the written affidavit supplied by the officer was insufficient to issue a warrant. The judge then swore the officer as a witness and questioned him until obtaining sufficient grounds to issue a warrant based upon this oral deposition. Nonetheless, we held that the evidence later obtained should have been suppressed because the statute in effect at the time, Utah Code Ann. § 77–54–4 (1978), did not allow the issuance of a warrant from an oral deposition. Clearly, significantly more time was involved in obtaining a warrant at that time than today.

¶ 40 Over the past twenty-five years, all branches of Utah's government have participated in overseeing an evolution of the warrant acquisition process. Under current rules, police can readily obtain a warrant, in most circumstances, in a very short amount of time. As far back as 1980, Utah Code section 77–7–10 allowed a magistrate to issue a warrant by "telegraph, telephone or other reasonable means." Likewise, section 77–23–204 allowed a magistrate to consider sworn oral testimony via telephone or other reasonable means in lieu of an affidavit and allowed the magistrate to direct the requesting officer to affix the magistrate's name to the warrant in lieu of signature.

¶ 41 More recently, in 2005, the legislature revised section 77–23–204 to further streamline the process. The statute now simply states, "A remotely communicated search warrant issued under Rule 40 of the Rules of Criminal Procedure shall be served in a written form upon the person or place to be served." The new statute allows us to maintain pace with technological developments which might speed and ease the warrant process by adjustments to rule 40 of the Utah Rules of Criminal Procedure—which rule controls the issuance of remote warrants. Currently rule 40 allows that "[a]ll communication between the magistrate and the peace officer or prosecuting attorney requesting the warrant may be remotely transmitted by voice, image, text, or any combination of those, or by other means." Utah. R. Civ. P. 40.

¶ 42 We whole-heartedly endorse the comments of the advisory committee, which state that the rule is intended to be interpreted liberally in order to facilitate remote communications as a means of applying for and issuing search warrants while preserving the integrity of the probable cause application and the terms of warrants that are authorized. We are confident that, were law enforcement officials to take advantage of available technology to apply for warrants, the significance of delay in the exigency analysis would markedly diminish.

¶ 43 Case law in this area is of little help. It is virtually impossible to extract from blood-alcohol related Fourth Amendment

cases a meaningful understanding of the standard against which the court is measuring delay. Were telephonic warrants available? We are seldom told. Yet, we know that the delay associated with telephonic warrants need not be great. *See United States v. Baker,* 520 F.Supp. 1080, 1083 (D.Iowa 1981) (finding that one hour and fifteen minutes was "abundant time" to obtain warrant by telephone, a process that often takes no more than thirty minutes). We also know that "the Mesa Police Department is able to obtain a warrant within as little as fifteen minutes and that delays of only fifteen to forty-five minutes are commonplace." *State v. Flannigan,* 194 Ariz. 150, 978 P.2d 127, 131 (App.1998). The record in this case does not disclose how much time would likely have been required for the officers to secure a warrant to extract Ms. Rodriguez's blood. We are confident, however, that courts and law enforcement officials in Utah, particularly in our urban regions, would have the wherewithal to duplicate the warrant acquisition standards of Mesa, Arizona. We agree with the sentiment of that case: "The mere possibility of delay does not give rise to an exigency." *Id.*

¶ 44 Was a magistrate readily available to review the warrant application? If not, why not? In *Schmerber,* the most definitive commentary by the United States Supreme Court on the subject of warrants, exigent circumstances, and blood-alcohol tests, the Court tells us that the police officer was required to appear before a magistrate and implies that magistrates were not particularly easy to locate. 384 U.S. 757, 86 S.Ct. 1826. In 1966, the Justices of the Supreme Court could not reasonably have foreseen the ubiquity of the cell phone, and only those conversant with the futuristic imaginings of science fiction would have been capable of describing the gadgetry that equips the interior of the typical police cruiser today.

¶ 45 Nor could the Court in 1966 have foreseen the evolution of law enforcement sophistication and professionalism that has occurred over the past forty years. The United States Supreme Court recently took note of this important development when it ended the application of the exclusionary rule as a sanction for violations of a police officer's obligation to knock and announce his presence before entering a dwelling to execute a warrant. *Hudson v. Michigan,* ―― U.S. ――, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006). Writing for a majority of the Court, Justice Scalia observed:

> Another development over the past half-century that deters civil-rights violations is the increasing professionalism of police forces.... Numerous sources are now available to teach officers and their supervisors what is required of them under this Court's cases, how to respect constitutional guarantees in various situations, and how to craft an effective regime for internal discipline.

*Id.* at 2168.

¶ 46 Were we to adopt a rule of per se exigency for alcohol-related blood seizures, we would remove much of the incentive to pursue progressive approaches to warrant acquisition that preserve the protections afforded by the warrant while meeting the legitimate interests of law enforcement. Today, Utah Rule of Criminal Procedure 40 exploits communications and information technology in the cause of making warrants more readily obtainable without compromising the core constitutional considerations of authenticity and impartiality. In most cases, a police officer has readily at hand several methods of applying for a search warrant from the scene of an accident, a medical facility, or any other location where probable cause has been established.

¶ 47 The State takes issue with the court of appeals' disapproving reaction to the fact that the officer who authorized the warrantless seizure of Ms. Rodriguez's blood never considered obtaining a warrant. The State appears to hold the view that a per se exigency rule is necessary in part because the typical police officer could not be expected to successfully complete an evaluation of the array of considerations that together comprise the "totality" of circumstances upon which a judgment about a warrant is made.

¶ 48 The court of appeals noted that the officer viewed the blood draw merely as a routine matter in the aftermath of an alcohol-related accident. The State is on target

when it notes that the officer's subjective belief is not relevant to an assessment of the reasonableness of his actions and also misses the point of the court's reference to the officer's absence of warrant awareness. It is clear to us that the court was disturbed by what the record suggests to be an instance of institutional disregard of a fundamental constitutional safeguard of individual rights: the warrant.

¶ 49 A police officer who has not even considered the potential need for a warrant will not, of course, be required to possess any skill or sensitivity in identifying and evaluating the state of the actual exigencies that confront him. Amici curiae suggest that it might be too much to ask a police officer to investigate every alcohol-related incident with the presumption that a blood draw must be supported by a warrant. Amici contend there is simply too much for a police officer to do and to think about to realistically expect the officer to take on the added burden of evaluating the availability of a warrant. This court, like the court of appeals, is confident that the law enforcement officers of this state are suitably equipped with the talent, training, and experience to permit them to exercise sound judgment when they conclude that an investigation would benefit from the acquisition of blood-alcohol evidence.

¶ 50 Finally, we believe that destruction of evidence brought on by the involuntary metabolic processes of the human body presents a less compelling case for exigency than do more traditional and volitional methods of evidence destruction. There exists considerable scientific literature on the subject of whether reliable conclusions about blood-alcohol concentrations at a prior time may be extrapolated from a test performed on blood drawn later. The State and amici cite numerous articles that question the reliability and utility of retrograde analysis of blood-alcohol evidence. Ms. Rodriguez counters with her own substantial bibliography. Who has the better science is not the question here. The fact that there has been serious scientific inquiry attempting to develop reliable methods to calculate past blood-alcohol concentrations is what is important. The same could not be said for more common-

place forms of evidence destruction, the use of toilets being the most prominent among them. We are unwilling to render ongoing scientific research into blood-alcohol dissipation rates irrelevant by bestowing categorical exigency status on seizures of blood.

## II. THE TOTALITY OF THE CIRCUMSTANCES JUSTIFIED THE WARRANTLESS DRAW OF MS. RODRIGUEZ'S BLOOD

■ ¶ 51 Whether exigent circumstances are present to justify a warrantless intrusion depends on "all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). Applying the exigency assessment guideposts set out in *City of Orem v. Henrie*, 868 P.2d 1384, 1388 (Utah Ct.App.1994), the court of appeals held that the blood draw failed the totality of the circumstances test. Our own review of the facts surrounding the blood draw compels us to the opposite conclusion reached by the court of appeals. This outcome is the result of balancing the state's interest in collecting evidence against the defendant's interests in privacy and bodily integrity.

¶ 52 The court of appeals concluded that the totality of the circumstances fell short of meeting the State's obligation to show exigent circumstances which justified its warrantless blood draw. It did credit the district court for taking into account the inherent dissipation of alcohol in the blood, the seriousness of the accident, and the clear presence of probable cause to believe that alcohol contributed to the accident.

¶ 53 Nevertheless, the court of appeals found the district court's failure to account for the question of time, the proximity of the magistrate, the alternatives explored and discarded by the officers, the delay the officers faced, the impact of the delay in obtaining viable evidence, and the point of time in the accident investigation when the decision was made to extract Ms. Rodriguez's blood was fatal to the trial court's totality of the circumstances analysis. *State v. Rodriguez*, 2004 UT App 198, ¶ 17, 93 P.3d 854. In sum, the

court of appeals appeared to focus its attention on the fact that the officers never considered applying for a warrant, much less exploring or discarding alternative courses of action.

¶ 54 We do not disregard this roster of relevant considerations compiled by the court of appeals. Each has its place in contributing to a clear understanding of what a reasonable officer would have apprehended at the time Ms. Rodriguez's blood draw occurred. *See, e.g., Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). We are dismayed by the officers' failure to consider the notion that the extraction of blood from a person's body might constitute a search requiring a warrant. In light of the confidence expressed earlier in this opinion in the evolving professionalism of the law enforcement officials who participated in Ms. Rodriguez's blood draw, we consider the major constitutional blind spot that this incident exposed disturbing.

¶ 55 We do not, however, agree with the court of appeals that the officers' belief that warrantless blood extractions were routine dooms the State's quest for exigency. Although we are concerned that the officers did not consider the warrant requirement, the subjective assessment about the need for a warrant is largely irrelevant to our totality of the circumstances analysis. It is an objective analysis in which the thought processes of any particular officer plays no role.

¶ 56 We also have misgivings about the certainty with which the court of appeals concluded that the decision to extract Ms. Rodriguez's blood was made at a time "when courts are open and search warrants can be readily requested." *Rodriguez*, 2004 UT App 198, ¶ 19, 93 P.3d 854. It is not clear to us that this assertion can be credibly derived from the agreed-upon fact that the accident occurred between 4:45 and 4:50 p.m. on a Wednesday.

¶ 57 Although we know that no one considered requesting a warrant before drawing Ms. Rodriguez's blood, the record reveals much about what the officers understood regarding the accident and Ms. Rodriguez's condition from the time the collision occurred until the time Ms. Rodriguez's blood was drawn. One fact dominates all others with respect to its relevance to whether the warrantless blood draw was reasonable: that Ms. Stewart was expected to succumb to her injuries. This fact significantly altered the warrant acquisition calculus that a reasonable law enforcement officer who has probable cause to believe an alcohol-related offense has occurred could be expected to apply. The severity of the possible alcohol-related offense bears directly on the presence or absence of an exigency sufficient to justify a blood draw without a warrant.

¶ 58 In this sense, warrantless blood draws are never "routine." Without the presence of other compelling circumstances, a law enforcement official who stopped a pedestrian suspected of public intoxication would not face an exigency sufficient to justify a warrantless blood draw. In such cases, the state has a negligible interest in acquiring the quality of alcohol evidence provided by a blood test uncompromised by considerations of dissipation during the warrant application process. Where an alcohol-related offense is minor, a warrantless blood draw, however modest it may be in the spectrum of bodily intrusions, will trespass on important constitutional rights.

¶ 59 Even where, as here, the alcohol-related offense is very serious, a warrantless blood draw cannot be "routine." Here, the evidence supporting the conclusion that probable cause existed to believe that Ms. Rodriguez was intoxicated at the time of the accident was overwhelming. Not only was a vodka bottle found at the scene, but the officer noted her slurred speech, bloodshot eyes, and odor of alcohol when he encountered Ms. Rodriguez at the hospital. The likelihood that the blood draw would detect alcohol was great. We agree with the district court that the seriousness of the accident coupled with the compelling evidence of Ms. Rodriguez's alcohol impairment is sufficient to establish that the interests of law enforcement outweighed, in this instance, Ms. Rodriguez's privacy interests.

¶ 60 In making what we believe to be the "discerning inquiry" into the justifications for the intrusion mandated by Justice Brennan

in *Winston v. Lee*, 470 U.S. 753, 760, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), we have not cast aside the *Henrie* factors that the court of appeals applied to reach a result contrary to ours. As our rejection of the State's quest for per se exigency makes clear, practical considerations associated with warrant acquisition remain central to inquiries into whether exigent circumstances justify a warrantless search. As technology reduces the amount of time necessary to obtain a warrant, we would expect a corresponding increase in the use of warrants.

¶ 61 Our result today is the product of our judgment that in this case the facts relating to the *Henrie* factors were subordinate to considerations of the severity of the accident and attendant offense and the obvious presence of Ms. Rodriguez's alcohol impairment as a contributing cause of Ms. Stewart's death.

## CONCLUSION

¶ 62 In light of the foregoing, it is difficult for us to imagine that the United States Supreme Court could muster the assurance that the consequences of alcohol dissipation are so great and the prospects for prompt warrant acquisition so remote that per se exigent circumstance status be awarded to seizures of blood for the purpose of gathering blood-alcohol evidence. Accordingly, we decline to grant per se exigent circumstance status to warrantless seizures of blood evidence. However, it is our opinion that the State did meet its obligation in this case to show that under the totality of the circumstances, both probable cause and exigent circumstances justified its warrantless blood draw.

¶ 63 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.