

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00182-CR

BRIAN LEE GREEN                                    APPELLANT

V.

THE STATE OF TEXAS                                      STATE

----------

FROM THE 235TH DISTRICT COURT OF COOKE COUNTY
TRIAL COURT NO. 12-00163

----------

## MEMORANDUM OPINION[1]

----------

In five issues, Appellant Brian Lee Green appeals his conviction for intoxication assault. We reverse and remand.

---

[1]*See* Tex. R. App. P. 47.4.

# I. Background

Green was arrested for driving while intoxicated (DWI) after he was involved in an accident that injured his girlfriend, Debora Babb. Prior to trial, Green filed a motion to suppress the blood test results.

Green and Babb were involved in an accident at approximately 7:00 a.m. on March 16, 2012. DPS Trooper Samuel Hellinger testified that when he arrived on the scene, Babb was lying on the ground receiving medical care,[2] and Green was at her feet. Trooper Hellinger testified that he spoke with Green, who told him that he had been driving and had rear-ended "a trailer [or] a vehicle in front of him that didn't have any lights on it whatsoever." Hellinger confirmed that Green's vehicle appeared to have rear-ended another vehicle, although when the officers arrived at the scene, no other vehicle was present.[3]

Trooper Hellinger testified that he noticed a strong odor of alcohol emitting from Green's breath and that Green had red, glassy, bloodshot eyes, slurred speech, and unsteady balance. Trooper Hellinger also testified that Green

---

[2]Cooke County EMS transported Babb from the scene to the North Texas Medical Center; she was then CareFlited to John Peter Smith Hospital.

[3]Trooper Hellinger later noticed a large commercial semitrailer located less than a mile from the location of the accident. He alerted Trooper King, who was assisting in the accident investigation and traffic control, to the location of the semitrailer. Trooper King then investigated the semitrailer and confirmed that it was the vehicle Green had struck. Trooper Hellinger did not examine or inspect the semitrailer.

appeared to be disoriented as to time.[4]  When questioned, Green denied that he had been drinking, but when he blew into a preliminary breath test, the device registered alcohol on his breath.  As a result, Trooper Hellinger performed the horizontal gaze nystagmus test (HGN) and observed all six clues, indicating intoxication.  Trooper Hellinger then arrested Green for DWI.

Prior to transporting Green to jail, Trooper Hellinger transported Green to the hospital to receive medical care.  Once at the hospital, Trooper Hellinger provided Green with the DIC-24 warnings[5] and asked him to consent to the taking of a blood sample.  Green refused.  Trooper Hellinger then completed a THP-51 form[6] and thereafter obtained a blood specimen from Green without a warrant or his consent.  The blood test, which was taken at 7:58 a.m.,

---

[4]When asked what time it was, Green stated that he believed it was between 2:00 and 4:00 in the morning.  The actual time was 7:17 a.m.

[5]The DIC-24 is the Texas Department of Public Safety's standard form containing the written warnings required by the transportation code to be read to an individual arrested for DWI before a peace officer requests a voluntary blood or breath sample from a person.  *See* Tex. Transp. Code Ann. § 724.015 (West Supp. 2015); *State v. Neesley*, 239 S.W.3d 780, 782 n.1 (Tex. Crim. App. 2007).

[6]Form THP–51 is the statutory authorization form that allows a peace officer to require that a hospital perform a mandatory blood draw.  *See* Tex. Transp. Code Ann. § 724.012(b) (West 2011); *Neesley*, 239 S.W.3d at 782 n.2; *Whitaker v. State*, No. 05-12-01116-CR, 2013 WL 5969560, at *2 n.2 (Tex. App.—Dallas Nov. 7, 2013, no pet.) (not designated for publication).

approximately an hour after the accident, revealed that Green had a blood-alcohol content of 0.173.[7]

Trooper Hellinger testified that, generally, when an individual refuses a blood draw, he would bring the person to the jail, and watch him while he filled out a blood search warrant affidavit. He would then have the affidavit notarized by a jailer and fax it to the judge, who would return a warrant by fax. In this case, Trooper Hellinger testified that he did not attempt to get a warrant. Instead, he relied solely upon section 724.012 of the transportation code, which authorized him to obtain Green's blood without a warrant and without Green's consent. He also admitted that had he not relied upon section 724.012, he could have obtained a warrant under the circumstances of this case.

Trooper Hellinger admitted that had he not relied upon the statute in this case, he could have presented a probable cause affidavit, even a handwritten one, by fax to a judge.[8] But he further added that, without a fax machine and notary on the hospital premises, he would not have been able to get a warrant until 11:00 a.m.[9] Trooper Hellinger also testified that the blood evidence would

---

[7]The legal limit is 0.08. *See* Tex. Penal Code Ann. § 49.01(2)(B) (West 2011).

[8]Trooper Hellinger testified that he probably could have used the hospital's fax machine, but he did not inquire that evening as to whether a notary was available on the premises.

[9]That would have been the time when he was able to get to the jail with Green once Green was released from the hospital.

4

have "changed significantly" *if* he had been forced to wait to obtain it. However, there is no evidence in this record as to whether he actually would have had to wait in these circumstances. Because he relied solely on the statute to authorize the blood draw, Trooper Hellinger did not ascertain whether he could have obtained a warrant that morning.

After hearing Trooper Hellinger's testimony and reviewing the dashboard camera footage, the trial court denied Green's motion to suppress.

## II. Motion to Suppress

In his first and second issues, Green argues that his Fourth Amendment rights were violated when Trooper Hellinger forced him to provide a blood sample without first obtaining a warrant.[10]

## A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at

---

[10]Green's third issue also challenges the warrantless, nonconsensual blood draw, while his fourth and fifth issues address the qualifications of the medical technician who took his blood sample. Based on our resolution of his first two issues, we do not reach his remaining issues. *See* Tex. R. App. P. 47.1.

673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).

## B. Analysis

The court of criminal appeals recently held that warrantless blood or breath samples taken without consent solely in reliance on transportation code provisions such as section 724.012 violate the warrant requirement of the Fourth Amendment. *State v. Villarreal*, No. PD-0306-14, 2014 WL 6734178, at *20 (Tex. Crim. App. Nov. 26, 2014). Trooper Hellinger's reliance upon section 724.012 for the warrantless, nonconsensual blood draw and his good-faith belief that the statute authorized the warrantless search do not overcome the exclusionary rule. *Lewis v. State*, No. 02-13-00416-CR, 2015 WL 1119966, at *2 (Tex. App.—Fort Worth Mar. 12, 2015, pet. filed) (mem. op., not designated for publication) (citing *Burks v. State*, 454 S.W.3d 705, 709 (Tex. App.—Fort Worth 2015, no pet.)).

The State argued at the suppression hearing that exigent circumstances existed to support the warrantless blood draw. But Trooper Hellinger admitted that he did not explore his ability to obtain a warrant under the circumstances and instead acted only in reliance upon section 724.012. At best, the evidence demonstrates that Trooper Hellinger simply did not know whether there were exigent circumstances. His failure to ascertain his ability to obtain a warrant while at the hospital with Green presents a fact situation similar to that in

*Schmerber v. California*, 384 U.S. 757 (1966).[11]  In discussing *Schmerber,* the Supreme Court, noting the technological advances in the fifty years since *Schmerber* evidenced by the fact that a majority of States now allow police officers to apply for search warrants remotely through means such as telephone, fax, electronic communication, and video conferencing, has admonished against ignoring the technological developments in warrant procedures at the risk of "diminish[ing] the incentive for jurisdictions 'to pursue progressive approaches to warrant acquisition that preserve the protections afforded by the warrant while meeting the legitimate interests of law enforcement.'"  *Missouri v. McNeely*, 133 S.Ct. 1552, 1561–63 (2013) (quoting *State v. Rodriguez*, 156 P.3d 771, 779 (Utah 2007)).  While *McNeely* acknowledged that such technological advances do not eliminate all delay,[12] the court did point out that, "technological developments that enable police officers to secure warrants more quickly, and do so without undermining the neutral magistrate judge's essential role as a check on police discretion, are relevant to an assessment of exigency."  *Id.* at 1562–63.

---

[11]The delay at issue in *Schmerber* resulted from the accused having to have been taken to the hospital.  *Id.*

[12]*McNeely* allows that some delay is inevitable because the suspect must be transported to a medical facility to conduct the blood draw.  *Id.* at 1561.  But in such circumstances, the Supreme Court points out that "an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer. In such a circumstance, there would be no plausible justification for an exception to the warrant requirement." *Id.*

Here, Trooper Hellinger had these technological resources legally available to him. Nevertheless, he made no attempt to ascertain whether he could employ them. Instead, he relied only upon section 724.012, which, at the time—more than two and a half years prior to the *Villarreal* decision—was understandable. *See also State v. Ruiz*, No. 13-13-00507-CR, 2015 WL 5626252, at *6 (Tex. App.—Corpus Christi Aug. 27, 2015, pet. filed) (affirming trial court's granting of motion to suppress where officer relied upon statute in conducting warrantless blood draw where State produced no evidence that a more expeditious process to obtain a warrant, such as by telephone, was not available); *Cole v. State*, 454 S.W.3d 89, 103 (Tex. App.—Texarkana 2014, pet. granted) (holding that the State failed to show exigent circumstances where no attempt was made to obtain a warrant, even though the officer knew neutral magistrates were on call and available to consider warrant requests, and other officers were available to assist in obtaining a warrant). The trial court likewise ruled without the benefit of *Villarreal*—which was issued almost eight months after the suppression hearing—and, in hindsight, erred in its application of the law to the facts of this case and, thus, in denying Green's motion to suppress. *See id.*

### III. Harm Analysis

Having found error, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment. *See* Tex. R. App. P. 44.2. Because the error is constitutional, we apply rule 44.2(a) and reverse unless we determine beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment. *See* Tex. R. App. P. 44.2(a). The question is whether the trial court's erroneous denial of Green's motion to suppress was harmless beyond a reasonable doubt. *See Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997). In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

We are directed that our harmless error analysis should not focus on the propriety of the outcome of the trial. Instead, we must calculate, as much as possible, the probable impact of the evidence on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001). We "should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment,'" and if applicable, we may consider the nature of the error, the extent that it was emphasized by the State, its probable collateral implications, and the weight a juror would probably place on

9

the error. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting Tex. R. App. P. 44.2(a)). This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner and not "in the light most favorable to the prosecution." *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989), *disagreed with in part on other grounds by Snowden*, 353 S.W.3d at 821–22.

The jury not only heard that Green's blood sample contained 0.173 grams of alcohol per 100 milliliters of blood but also heard expert testimony that, based upon retrograde extrapolation, Green's blood alcohol content at the time of the accident was between 0.188 and 0.193—more than two times the legal limit, and both prosecutors emphasized the blood test results during closing arguments in the guilt-innocence phase of the trial. After walking the jury through the elements of the offense and arguing that other evidence showed that Green was intoxicated, the first prosecutor argued,

> You didn't need to hear what the blood tests results were to know that that man is intoxicated, because you-all have that kind of common sense, and you-all have those life experiences. But we didn't stop there.
>
> We brought you the blood draw. So intoxication and -- well, and then when we brought you the blood draw, boy, did you see the rabbit trails and the smoke screens start up. They didn't want that blood test. They didn't like that blood test. A .173, woo. You know, when the legal limit is .08, that's over twice the legal limit to be driving.
>
> . . . .

So, then it gets to -- it gets to the DPS Lab, and it's tested there by a qualified chemist. You heard him under cross-examination. He could answer every question. He did the test not once, he did it twice. And he got a result of .173, which shows excessive intoxication. . . .

And then what did -- what happened with that blood? Who was it released to? It was released to Dr. Gary Wimbish? And who's Dr. Gary Wimbish? A representative of who? Mr. Green. He's a representative of the Defense. Dr. Gary Wimbish. And if Dr. Gary Wimbish would have had anything to say about that blood sample, that it wasn't an appropriate sample, or that it wasn't a .173, you know who we would have heard on the stand testifying, Dr. Gary Wimbish –

In the State's rebuttal, the other prosecutor restated, "Folks, the blood test, 1.7. And if you look at the way it would have been an hour earlier, a .188 up to a .193, oh, he was not intoxicated, was he? He was drunk."

Based on the above, in calculating, as much as possible, the probable impact of the evidence on the jury, we hold that it is likely that the jury gave substantial weight to the warrantless blood test results. And so while there was other evidence of Green's intoxication—a strong odor of alcohol on Green's breath, the presence of alcohol in the breath test, red, glassy, bloodshot eyes, slurred speech, unsteady balance, disorientation as to time, and the presence of all six clues of the HGN test[13]—we cannot conclude beyond a reasonable doubt that the blood-alcohol evidence did not contribute to the jury's verdict.

---

[13]The dissent points to other evidence—that Green fell asleep in the patrol car en route to the hospital—as evidence of intoxication. The dashboard camera video does reveal that Green appeared tired and closed his eyes more than once, but that behavior is equally consistent with the uncontroverted testimony

11

After carefully reviewing the record and performing the required harm analysis under rule 44.2(a), we are unable to determine beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment. *See Williams*, 958 S.W.2d at 195. Accordingly, we sustain Green's first and second issues and do not reach his remaining three issues. *See* Tex. R. App. P. 47.1.

## IV. Conclusion

Because we hold that the trial court erred by denying Green's motion to suppress and that there is a reasonable possibility that this constitutional error contributed to Green's conviction or punishment, we reverse the trial court's order denying Green's motion to suppress and the trial court's judgment and remand this case to the trial court for further proceedings consistent with this opinion. *See* Tex. R. App. P. 43.2(d).

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and SUDDERTH, JJ.

LIVINGSTON, C.J., filed a dissenting opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: February 4, 2016

---

that Green and Babb had been out all night and had not slept prior to the accident.