Argued and submitted January 26, 2021, reversed and remanded June 15, 2022

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

FRANCIS MICHAEL PORTULANO,
*Defendant-Appellant.*

Josephine County Circuit Court
17CR05939; A171262

514 P3d 93

Defendant appeals from a judgment of conviction for driving under the influence of intoxicants (DUII), ORS 813.010. He argues that the trial court erred, under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution, when it denied his motion to suppress evidence obtained in a warrantless blood draw. Defendant asserts that the Oregon Supreme Court's decision in *State v. McCarthy*, 369 Or 129, 501 P3d 478 (2021), implicitly supplanted *State v. Machuca*, 347 Or 644, 227 P3d 729 (2010), and that under *McCarthy*, his conviction must be reversed. *Held*: The Court of Appeals concluded that *McCarthy* did not disavow *Machuca*. Thus, as to Article I, section 9, the trial court did not err. As to the Fourth Amendment, United States Supreme Court precedent requires courts to consider the totality of the circumstances in determining whether an exigency existed sufficient to justify a warrantless blood draw. Here, the court concluded that the totality of the circumstances did not support the existence of an exigency. Accordingly, the warrantless seizure of defendant's blood was a violation of the Fourth and Fourteenth Amendments.

Reversed and remanded.

Thomas M. Hull, Judge.

Nora Coon, Deputy Public Defendant, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellant Section, Office of Public Defense Services.

Joanna L. Jenkins, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before James, Presiding Judge, and Lagesen, Chief Judge, and Kamins, Judge.

JAMES, P. J.

Reversed and remanded.

Lagesen, C. J., concurring.

Kamins, J., dissenting.

**JAMES, P. J.**

This case involves exigency, blood draws, and electronic warrants. Defendant appeals from a judgment of conviction of, among other things, one count of driving under the influence of intoxicants (DUII) constituting a felony, ORS 813.010, arguing that the trial court erred, under Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the United States Constitution, in denying his motion to suppress evidence obtained in a warrantless blood draw. As discussed in detail below, at the time of this incident, Josephine County law enforcement purposefully declined to utilize electronic warrant procedures for DUII blood draws, instead relying exclusively on claims of exigent circumstances from the dissipation of blood alcohol levels to justify warrantless blood draws. As such, we are called upon to discern the proper consideration of the availability and use of electronic warrant procedures—or the lack thereof—in the calculation of exigency for warrantless DUII blood draws.

For the purposes of the Oregon Constitution this requires us to interpret *State v. Machuca*, 347 Or 644, 657, 227 P3d 729 (2010) in light of *State v. McCarthy*, 369 Or 129, 501 P3d 478 (2021). Defendant argues that, given *McCarthy*, "unless the county has affirmatively adopted policies to create an efficient electronic warrant process, that county cannot rely solely on the potential loss of evidence while police wait for a warrant to establish exigency." The state argues that "*McCarthy* does not alter the [*Machuca*] analysis applicable here." As we explain, the truth lies somewhere in the middle. *McCarthy* does affect the calculation of exigency for DUII blood draws under *Machuca*, and how it is litigated. However, we ultimately conclude that, under *Machuca*, the warrantless blood draw here was permissible.

We reach a different conclusion under the Fourth Amendment. As we explain, unlike the Oregon Supreme Court's analysis in *Machuca*, the Fourth Amendment analysis articulated in *Missouri v. McNeely*, 569 US 141, 148, 133 S Ct 1552, 185 L Ed 2d 696 (2013) requires consideration of the totality of the circumstances to determine if exigency existed, and the dissipation of alcohol in the blood is but one

of many factors to consider. Here, the totality of the circumstances includes the availability of electronic warrant procedures, the availability of judicial magistrates, and the purposeful choice by law enforcement countywide to decline to ever, under any circumstance, exercise that option. *McNeely* does not permit a functional *per se* exigency, and we accordingly reverse because the warrantless blood draw violated the Fourth Amendment.

When reviewing a denial of a motion to suppress, "we are bound by the facts found by the trial court that are supported by evidence in the record." *State v. Gerety*, 286 Or App 175, 179, 399 P3d 1049 (2017). Whether those facts describe circumstances that justify a warrantless search or seizure is a question of law. The facts in this case are undisputed.

In Josephine County on October 19, 2016, at around 9:00 p.m., dispatch notified Trooper Heather West of a suspicious call. Using the onboard computer in her patrol car, West was able to select and read the details of the call. Defendant's wife reported that defendant "was at a ∗∗∗ bar, that he drives intoxicated on a regular basis, that he's suspended from driving, and that he would soon be leaving that bar"; upon his return, he would likely be violent with her. West parked outside of the bar, and again, using her onboard computer, ran the car's registration and confirmed that it belonged to defendant; Department of Motor Vehicles records returned defendant "as felony suspended driving."

At approximately 9:40 p.m., West saw defendant's car driving away from the bar and she pulled out behind him. When defendant accelerated, West turned on her overhead lights. Defendant continued accelerating, reaching speeds above 70 mph. The pursuit ended at approximately 9:50 p.m. when defendant crashed, flipping the car upside down and trapping himself in the driver's seat. The crash occurred in a rural part of the county.

While waiting for emergency personnel to respond, West focused on preservation of life by securing scene safety. She set up traffic flares, communicated with defendant through a broken window, and provided updates to

responding units. Medical personnel arrived at approximately 10:00 p.m. Ultimately, two fire trucks, an ambulance, and one or two tow trucks responded. Sergeant Boice, Trooper Henderson, and Officer Wallace each responded as well. None of the police officers directly helped to extricate defendant from his vehicle: West and Boice focused on "preserving roadway evidence, making sure that any motoring public didn't * * * come up on the crash and cause further hazards," Henderson provided additional backup to West and Boice, and Wallace began conducting a traffic investigation.

Extricating defendant from his vehicle took the nonpolice emergency responders 30 to 40 minutes. Once defendant had been extricated, at approximately 10:40 p.m., emergency personnel advised West that they could smell the strong odor of alcohol coming from defendant. At that point, Boice instructed Henderson to follow the ambulance to the hospital and to secure a blood draw from defendant; they did not discuss a search warrant.

Back at the crime scene, as defendant was in transport to the hospital, Wallace continued his traffic investigation, and West and Boice headed to defendant's wife's house to inform her of the accident. West testified that two officers were necessary both for general officer safety and because they did not know the full extent of defendant's injuries, and therefore, they could be making a notification of death. They arrived at the house about 10 minutes later, and after calling defendant's wife, they discovered that she had already learned of the accident and was on her way to the hospital. West then headed to the hospital, arriving 15 to 20 minutes later.

Defendant arrived at hospital around 11:00 p.m. Upon arrival Henderson told the staff that he wanted a blood draw. Defendant apparently refused that request and, at 11:04 p.m., Henderson instructed a phlebotomist to perform a blood draw. Medical personnel then took defendant off for x-ray imaging. The blood draw eventually disclosed a blood alcohol content (BAC) of 0.148. West testified that based on her training and experience, once drinking has stopped, BAC dissipates at an estimated rate of .015 per hour.

At trial, defendant moved to suppress the evidence obtained in the warrantless blood draw. At the motion hearing, the court took notice of ORS 133.545(7) and (8), which relate to electronic warrants and provide:

"(7)   Instead of the written affidavit described in subsection (6) of this section, the judge may take an oral statement under oath. The oral statement shall be recorded and a copy of the recording submitted to the judge who took the oral statement. In such cases, the judge shall certify that the recording of the sworn oral statement is a true recording of the oral statement under oath and shall retain the recording as part of the record of proceedings for the issuance of the warrant. The recording shall constitute an affidavit for the purposes of this section. The applicant shall retain a copy of the recording and shall provide a copy of the recording to the district attorney if the district attorney is not the applicant.

"(8)(a)   In addition to the procedure set out in subsection (7) of this section, the proposed warrant and the affidavit may be sent to the court by facsimile transmission or any similar electronic transmission that delivers a complete printable image of the signed affidavit and proposed warrant. The affidavit may have a notarized acknowledgment, or the affiant may swear to the affidavit by telephone. If the affiant swears to the affidavit by telephone, the affidavit may be signed electronically. A judge administering an oath telephonically under this subsection must execute a declaration that recites the manner and time of the oath's administration. The declaration must be filed with the return."

Evidence at the motion hearing showed the following. From the perspective of the judiciary in Josephine County, judges were available to provide electronic warrants. Officers in Josephine County were emailed a list of rotating judges that are available around the clock for issuing search warrants. Additionally, by making a call on speaker phone, Josephine County police officers could use the WatchGuard system in their patrol vehicles to record both sides of a telephone conversation. Cell phone service permitting, the police officers also had email capabilities from their patrol cars. Despite this infrastructure, however, none of the testifying

officers had ever applied for a telephonic search warrant in Josephine County.

        The initial case officer is responsible for writing the warrant application. West was the initial case officer; accordingly, it would have been her responsibility to apply for a search warrant on the night of the arrest.

        West did not speak with Boice, Henderson, or Wallace about obtaining a warrant to withdraw defendant's blood. On the night of the incident, West had no experience applying for electronic search warrants. West testified that, in Josephine County, if a person arrested for DUII refused a breath test, officers did not apply for a search warrant to obtain a blood draw. Rather, a refusal at the Josephine County jail would either end the investigation, or, depending on the circumstances, the suspect would be brought to the hospital for a warrantless blood draw based on exigent circumstances. By contrast, in Lane County, where West worked at the time of the hearing, if a person refused a breath test, the officer would then apply for a search warrant to obtain a blood draw.

        At the time of the hearing, Boice had over 18 years of police experience in both Jackson County and Josephine County. He had never applied for a telephonic search warrant in Josephine County. Boice had applied for telephonic search warrants for DUII blood draws in neighboring Jackson County. He did not specify the amount of time that it takes, but did describe the process:

    "[BOICE]:    So once you decide that you're going to apply for a telephonic search warrant begins the process of filling out a, what we have now in Jackson County is a telephonic search warrant template.

    "[DEFENSE COUNSEL]:    Okay.

    "[BOICE]:    And once the facts of the case and your probable cause are recorded, you have to acquire an on call Judge. They also have lives, especially in the middle of the night and they don't always answer initially. So you have, you have to, and I don't blame them, so you have to locate one and actually get one. The last Jackson County search warrant that I wrote telephonically, we had to go to a second

Judge and once the Judge answered, you have to have the Dispatch Center, so Southern Oregon Communications, or the OSP, Southern Communications Center, SCC has to contact the Judge by phone, initiate the phone call, explain to them what's going on, and they record the phone call for you, or you can just deal with the Judge directly[—]

"[DEFENSE COUNSEL]:    Okay.

"[BOICE]:    [—]and record it via your patrol car camera [because] usually you're just sitting outside the hospital in your patrol car. You then read the Judge the search warrant and the affidavit and at which point you swear to it and they authorize signature for the Judge, obviously over the phone. At that point you can go and serve the search warrant.

"[DEFENSE COUNSEL]:    That sounds like it's pretty quick.

"[BOICE]:    Hardly.

"[DEFENSE COUNSEL]:    As long as they pick up the phone, right?

"[BOICE]:    Yes.

"[DEFENSE COUNSEL]:    Okay. So that's not [going to] be any five hours, right?

"[BOICE]:    A telephonic search warrant taking five hours? No, I don't believe so."

Boice testified, however, that the process for obtaining a blood draw after a breath test refusal is different in Josephine County than in Jackson County:

"[BOICE]:    [You're asking, in Jackson County, w]ould I take a blood draw after they refused a breath test if *** I did not have a warrant?

"[DEFENSE COUNSEL]:    Correct.

"[BOICE]:    No, I would not. Unless there was exigency and another crime involved.

"[DEFENSE COUNSEL]:    But in Josephine County you would?

"[BOICE]:    Based on exigency, yes.

"[DEFENSE COUNSEL]:   And the only exigency being the evaporation of the alcohol, the evanescence of the alcohol, the dissipation of the alcohol?

"[BOICE]:   That's what your exigency is based on, yes ma'am."

Henderson had served as a Josephine County police officer since 1997. She had never applied for a telephonic search warrant, nor had she ever applied for a search warrant to withdraw blood in a DUII arrest.

Multiple officer witnesses attempted to estimate the time it would take to obtain a DUII blood draw warrant in Josephine County, extrapolating from narcotics warrants. In Henderson's experience, the application process for a written warrant in a narcotics case takes approximately two hours. Based on Boice's experience applying for narcotics search warrants, he estimated that applying for a search warrant for a DUII case in Josephine County would have taken no less than five hours.

In denying the motion to suppress, the court ruled that exigent circumstances justified a warrantless blood draw based on several factors. Probable cause, which is necessary when applying for a search warrant, was not established until paramedics notified West of the odor of alcohol emanating from defendant. Accordingly, about 45 minutes to an hour passed between when West had probable cause and when the warrantless blood draw occurred. The court noted:

"I'm not stating that you draw the line at when the blood draw was taken at 11:04, but realize that we have these other exigencies: We have a person in the emergency room that as Trooper Henderson testified to was in ex, in extreme pain and was getting ready to be sent off for x-rays. And so if they can't get the blood draw before the person's sent off to get x-rays, how long is that going to take? That wasn't really, that, that wasn't gone into, but then it didn't appear that [defendant] was then available for questioning until sometime after midnight which I think would be too long to wait to do the blood draw and the dissipation rate of alcohol from the blood is high enough that the officer shouldn't have to wait until after midnight[.]"

The court also considered the practical problems in obtaining a warrant that existed at the time:

"Okay one of those practical problems is based upon Sergeant Boice's testimony, in 2016 they didn't have this template that they use apparently regularly in Jackson County. I find it somewhat, well I find it interesting that they have a completely different policy of how they deal with this in Jackson County than they do here. Somebody gives them the idea that they're not [going to] blow here in Josephine County, they go directly to the hospital and take a draw and depend upon the fact that the dissipation rate is enough of an exigency to allow them to that. Apparently in Jackson County they absolutely don't do that. It almost sounds like they go, they got through the admonishment, they read them the implied consent rights, they wait their 15 minutes, they wait until the guy refuses, then they get on the phone, they have a template, they go through the process to obtain a telephonic warrant, or not under those circumstances. That's what I glean from Trooper Boice's testimony. He didn't state how long it took and he wasn't asked how long it took to get a telephonic warrant in Jackson County. The, but a lot of those technologies didn't exist in 2016. It didn't appear that he had, that they had their template and they were not engaged in doing that in Jackson County in 2016. And I, the reason why I keep saying that is because I believe things are different now. And so if I was hearing this, and this was a 2018 case, I think I might come to a different conclusion with regard to the motion to suppress. I, I don't think at the time this, and I'm using technologies broadly, I mean the, certainly they had the technology to make the call, but this was not a process, this still would take, the officer would have needed to, whether to just pull over in her patrol vehicle or go somewhere to come up with an affidavit. And she would have been, she, she would have been writing this from scratch without * * * necessarily any sort of template and composing this affidavit and that's [going to] take longer. And I think that connected with then contacting a Judge. Certainly there was a number. There very likely would have been a Judge on the other end of the phone. We have on call Judges where we rotate it week by week, and when we're on, we're on, and we expect a call. And so, but that would take some time and whether they ran then, then made another call from the Southern Dispatch Center or recorded as Senior Trooper, or Sergeant Boice had stated, could just do the

call from the patrol vehicle and record it on the, on the, essentially the WatchGuard. I mean he, he gave that as an alternative. "I don't think under these circumstances that was going to get done in the 45 minutes to an hour that I see as the window from when Trooper West had probable cause to, that [defendant] was driving under the influence of intoxicants to, thereabouts of the blood draw. Whether that was 11:15, even though the blood draw was taken at 11:04, [defendant] was then rushed off to x-rays, so there's about an hour there, 45 minutes to an hour I don't believe that that would have happened."

## ANALYSIS

Before we address a federal constitutional claim, the proper sequence is to first analyze the state constitutional claim. *Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981). For our purposes here, however, we discuss both the state and federal constitutional approaches to warrantless blood draws together, so as to better explain their differences. We will then apply them sequentially, beginning, as appropriate, with the state constitution.

"A blood draw conducted by the police is simultaneously a search of a person and a seizure of an 'effect'—that person's blood." *State v. Perryman*, 275 Or App 631, 637, 365 P3d 628 (2015). "Such an invasion of bodily integrity implicates an individual's most personal and deep-rooted expectations of privacy." *Missouri v. McNeely*, 569 US 141, 148, 133 S Ct 1552, 185 L Ed 2d 696 (2013). Accordingly, a blood draw "implicates constitutional guarantees against unreasonable searches and seizures" under both the state and federal constitutions. *State v. Milligan*, 304 Or 659, 664, 748 P2d 130 (1988); *see also Schmerber v. California*, 384 US 757, 767, 86 S Ct 1826, 16 L Ed 2d 908 (1966) ("[Blood] testing procedures plainly constitute searches of 'persons,' and depend antecedently upon seizures of 'persons,' within the meaning of [the Fourth Amendment.]").

A.  *Warrantless Blood Draws Under Article I, Section 9, and* State v. Machuca

Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against

unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Under Article I, section 9, a warrantless search or seizure, such as a forced blood draw, is presumptively unreasonable. *Perryman*, 275 Or App at 637. However, the state may overcome this presumption by demonstrating that a warrantless search fell within a specifically established and carefully delineated exception to the warrant requirement. *Id.*; *see also State v. Baker*, 350 Or 641, 647, 260 P3d 476 (2011) ("The state has the burden of proving that circumstances existing at the time were sufficient to satisfy any exception to the warrant requirement.").

One of the well-recognized exceptions to the warrant requirement exists when the police have probable cause to arrest the suspect, coupled with exigent circumstances. *State v. Sullivan*, 265 Or App 62, 67, 333 P3d 1201 (2014). "Exigent circumstances include, among other things, situations in which immediate action is necessary to prevent the disappearance, dissipation, or destruction of evidence." *State v. Meharry*, 342 Or 173, 177, 149 P3d 1155 (2006). In the context of a DUII investigation, the natural dissipation of alcohol by metabolic processes threatens the destruction of evidence. And because the percentage of alcohol in the suspect's blood begins to diminish shortly after drinking stops, exigent circumstance often exist. *Perryman*, 275 Or App at 638.

In 2010, the Oregon Supreme Court held that under Article I, section 9, a warrantless blood draw in a DUII case is almost always justified. *Machuca*, 347 Or at 657. More specifically, due to the evanescent nature of alcohol in the blood, rarely will an exigency *not* be found. *Id.*

In *Machuca*, the defendant was transported to the hospital after suffering injuries in a single-car accident. *Id.* at 646. Approximately 70 minutes after the investigating officer "concluded that there was probable cause to believe that defendant had committed the crime of DUII," he instructed a nurse to conduct a warrantless blood draw of the defendant. *Id.* at 647. Before trial, the defendant filed

a motion to suppress the blood alcohol evidence, arguing that the warrantless blood draw violated his rights under Article I, section 9, and the Fourth Amendment. *Id.* The Oregon Supreme Court upheld the trial court's denial of the defendant's motion to suppress, holding that the warrantless blood draw did not violate constitutional protections against warrantless searches or seizures because the officer had probable cause coupled with an exigent circumstance, namely, the natural dissipation of the defendant's BAC. *Id.* at 656-57.

*Machuca*'s analysis began by disavowing the court's prior analysis in *State v. Moylett*, 313 Or 540, 544, 836 P2d 1329 (1992). In *Machuca*, the court had held that that the mere fact that alcohol was dissipating was insufficient to establish an exigency, reasoning:

> "The exigency created by the dissipating evidence of blood alcohol, however, did not make the blood sample seizures *per se* reasonable under Article I, section 9. The state was still required to prove, in order to justify the warrantless extraction of defendant's blood, that it could not have obtained a search warrant without sacrificing the evidence and that the blood sample that it obtained had been extracted promptly."

*Machuca*, 347 Or at 656 (internal quotation marks and citations omitted). However, the court concluded, not that the reasoning of *Moylett* was flawed, but that its practical application had resulted in an improper focus on the speed of warrant acquisition, and therefore it was disavowed:

> "After examining the cases set out above, we conclude that the exigent circumstances analysis set out in *Moylett*, which required the state to prove 'that it could not have obtained a search warrant without sacrificing the evidence,' unnecessarily deviated from this court's established case law. Until *Moylett*, the court's focus had been on the exigency created by blood alcohol dissipation. *Moylett*, however, shifted that focus away from the blood alcohol exigency itself and onto the speed with which a warrant presumably could have issued in a particular case. In our view, that shift was unsupported by the cases that preceded it, and we disavow it now."

*Id*.; *see also State v. Mazzola*, 356 Or 804, 814-15, 345 P3d 424 (2015) (discussing *Machuca*'s disavowal of *Moylett*).

     *Machuca* replaced the *Moylett* analysis with a model that focused almost exclusively on the dissipation of alcohol.

> "It may be true, phenomenologically, that, among such cases, there will be instances in which a warrant could have been both obtained and executed in a timely fashion. The mere possibility, however, that such situations may occur from time to time does not justify ignoring the inescapable fact that, in every such case, evidence is disappearing and minutes count. We therefore declare that, for purposes of the Oregon Constitution, the evanescent nature of a suspect's blood alcohol content is an exigent circumstance that will ordinarily permit a warrantless blood draw of the kind taken here. We do so, however, understanding that particular facts may show, in the rare case, that a warrant could have been obtained and executed *significantly* faster than the actual process otherwise used under the circumstances. We anticipate that only in those rare cases will a warrantless blood draw be unconstitutional."

*Machuca*, 347 Or at 656-57 (emphasis in original).

     In *Machuca*, the court did not elaborate on how such a "rare case" would be shown, nor whose burden it would be.[1] Would the defendant show that a warrant could have been obtained—making it the rare case, or would the state have to show that a warrant could not have been obtained, making it not the rare case? Nor did the *Machuca* court elaborate on how a court is to evaluate the constitutionality of a warrantless seizure and search through examining whether a hypothetical warrant could have been executed "significantly faster"—a unique standard that is not found

---

[1] Although *Machuca* held out an escape valve for a "rare case," where a warrant could have been obtained and executed significantly faster than the process used, that rare case might be fictional. In disavowing *Moylett*, the court in *Machuca* revived the analysis of *Milligan* that a "[w]arrantless seizure and search under such circumstances therefore is constitutionally justified, unless a warrant can be obtained without sacrificing the evidence." 304 Or at 665-66. However, as noted in *Machuca*, "*Milligan*, however, illustrates that when probable cause to arrest for a crime involving the blood alcohol content of the suspect is combined with the undisputed evanescent nature of alcohol in the blood, those facts are a sufficient basis to conclude that a warrant could not have been obtained without sacrificing that evidence." 347 Or at 656.

elsewhere in constitutional analysis, or in other contexts. The court itself acknowledged some of these unresolved questions in *State v Ritz*, 361 Or 781, 793-94, 399 P3d 421 (2017):

"The state reads both *Machuca* and *Mazzola* as upholding the constitutionality of a warrantless exigency search based on the loss of any evidence of an intoxicating substance in the suspect's body. * * *

"Defendant, on the other hand, contends that an exigency search is justified only when the law enforcement interests advanced by a warrantless search outweigh the privacy interests at stake. Defendant argues that, although preventing the destruction of evidence is a legitimate law enforcement interest, the weight of that interest must be discounted by the chance that an exigency search will fail to prevent the evidence from being destroyed. Defendant points out that, in this case, in order to preserve defendant's BAC evidence without a warrant, the officers were statutorily required to obtain his consent, which the investigating officers had no reason to expect.

"* * * * *

"At its core, the parties' dispute is about the factors that courts should consider, and how those factors should be weighed, in determining whether an exigency search is justified. The state, in effect, gives decisive weight to the question of whether obtaining a warrant would delay preserving evidence that is dissipating. Defendant maintains that preventing the further dissipation of evidence is merely a component of the law enforcement interest that must then be weighed against the extent the privacy interests invaded by a search.

"The record before us, however, does not allow us to resolve that dispute."

Questions aside, *Machuca* controls the Article I, section 9 analysis for warrantless blood draws. That constitutional analysis may be characterized as a race to the needle approach. If an officer can obtain a blood sample from a suspect faster than she can obtain a warrant from a magistrate, then, under *Machuca*, a warrantless blood draw is permissible. *Id.*

B.    *Warrantless Blood Draws Under the Fourth Amendment and* Missouri v. McNeely

The Fourth Amendment provides, in relevant part, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause * * *." Compulsory blood draws are "intrusions into the human body" subject to the Fourth Amendment's prohibition on unreasonable searches and seizures. *Schmerber*, 384 US at 767-68.

In *Schmerber*, the Court noted:

"The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.

"Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned. * * * The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great."

*Id.* at 769-70.

The Supreme Court reaffirmed those principles in *Birchfield v. North Dakota*, 579 US 438, 136 S Ct 2160, 195 L Ed 2d 560 (2016), where it distinguished breath tests from blood tests:

"The impact of breath tests on privacy is slight, and the need for [blood alcohol concentration] testing is great.

"We reach a different conclusion with respect to blood tests. Blood tests are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test."

*Id.* at 474.

The prohibition against unreasonable searches or seizures under the Fourth Amendment shares many similarities with Article I, section 9. However, in the context of a warrantless blood draw for purposes of a DUII investigation, the exigency calculation is not the same. After *Schmerber*, courts split on whether exigency was judged under a totality analysis, or whether the involvement of intoxicated driving, or an accompanying accident, created a type of *per se* exigency in all instances. *See, e.g.*, *State v. Johnson*, 744 NW2d 340 (Iowa 2008) (applying totality analysis), *State v. Rodriguez*, 2007 UT 15, 156 P3d 771 (same), *State v. Shriner*, 751 NW2d 538 (Minn 2008) (holding that the natural dissipation of blood-alcohol evidence alone constitutes a *per se* exigency); *State v. Bohling*, 173 Wis 2d 529, 494 NW2d 399 (1993) (same); *State v. Woolery*, 116 Idaho 368, 775 P2d 1210 (1989) (same). The Court took review in *McNeely* to resolve that split of authority, and to clarify "whether the natural dissipation of alcohol in the bloodstream establishes a *per se* exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations." *McNeely*, 569 US at 147. The Court answered with a firm rejection of a *per se* rule, holding that the context of impaired driving and blood draws is no different from traditional exigency—the state has the burden to establish the exigency under the totality of the circumstances. *Id.* at 156 ("Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances.").

Although the Court did not provide a "detailed discussion of *all* the relevant factors that can be taken into account in determining the reasonableness of acting without a warrant," several factors were discussed. *Id.* at 165 (emphasis added). These include: (1) the availability of a magistrate; (2) the need for police to attend to and investigate a car accident; (3) technology that enables police to secure warrants quickly; (4) the procedures for obtaining a warrant; and (5) other practical problems that prevent law enforcement from obtaining a warrant within a timeframe that still preserves the evidence. *Id.* at 155-56, 164.

*McNeely*'s resolution of the split of authority eliminated any legitimacy of a *per se* analysis under the Fourth Amendment in the blood draw context. As with typical exigency, the state has the burden to show, under the specific facts and circumstances of the case, that the exigency exists. Accordingly, under the Fourth Amendment, an officer's reasonable belief that obtaining a warrant will not be significantly faster than obtaining the suspect's blood is merely one consideration under the totality of the circumstances. *Id*. at 157. Critically, as explained below in our discussion differentiating Article I, section 9, from the Fourth Amendment, *McNeely* expressly rejected the argument that "a warrantless blood draw is permissible if the officer could not secure a warrant (or reasonably believed he could not secure a warrant) in the time it takes to transport the suspect to a hospital or similar facility and obtain medical assistance." *Id*. at 156-57 (rejecting the concurrence of Justice Roberts). In rejecting that argument, the Court recognized that such a rule—the race to the needle approach of *Machuca*—was functionally a "modified *per se* rule." *Id*. at 157.

The Court explained that "making exigency completely dependent on the window of time between an arrest and a blood test produces odd consequences." *Id*. For example, under a race to the needle approach, "if a police officer serendipitously stops a suspect near an emergency room, the officer may conduct a nonconsensual warrantless blood draw even if all agree that a warrant could be obtained with very little delay under the circumstances (perhaps with far less delay than an average ride to the hospital in the jurisdiction)." *Id*. Next, such an approach "might discourage efforts to expedite the warrant process because it categorically authorizes warrantless blood draws so long as it takes more time to secure a warrant than to obtain medical assistance." *Id*. Moreover, pinning the warrant requirement on the expeditiousness of the procedure in place "would improperly ignore the current and future technological developments in warrant procedures, and might well diminish the incentive for jurisdictions to pursue progressive approaches to warrant acquisition that preserve the protections afforded by the warrant while meeting the legitimate interests of law enforcement." *Id*. at 156 (internal quotation marks omitted);

*see also Rodriguez*, 156 P3d at 779. And as mentioned, such an approach would be, in essence, a "modified *per se* rule" that is at odds with the totality of the circumstances framework demanded by the Fourth Amendment. *McNeely*, 569 US at 157.

C.   State v. McCarthy

    The approaches of *Machuca* and *McNeely* juxtaposed, we now turn back to Article I, section, 9, and the effect, if any, of *McCarthy*, 369 Or at 170-71. There, the Oregon Supreme Court disavowed the *per se* automobile exception, and in so doing, drew heavily on *McNeely*. The court began by noting:

> "[B]oth this court and the Supreme Court have recognized problems with *per se* exceptions to warrant requirements. In *McNeely*, the Court rejected an argument that the natural metabolization of alcohol in the bloodstream establishes a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all cases involving driving under the influence of alcohol.
>
> "In doing so, the Court acknowledged that some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test, but it determined that each case should be decided on its own facts, and that a *per se* rule would reflect considerable overgeneralization. \*\*\* In addition, the Court observed that a *per se* rule would improperly ignore the current and future technological developments in warrant procedures, and might well diminish the incentive for jurisdictions to pursue progressive approaches to warrant acquisition that preserve the protections afforded by the warrant while meeting the legitimate interests of law enforcement. \*\*\*
>
> "Thus, even in circumstances where the sought-after evidence is actually dissipating, the Court declined to create a *per se* rule. Such a rule would be overbroad, could discourage the development and utilization of improvements to the warrant process, and was not necessary."

*McCarthy*, 369 Or at 170-71 (internal quotation marks and citations omitted).

The Oregon Supreme Court then expressed juris-prudential concerns that motivated the *majority* in *McNeely*,

"Following *McNeely*, this court has also expressed concern about creating broad exceptions to the warrant requirement based on generalizations about the length of time it takes to get a warrant."

*McCarthy*, 369 Or at 171. The court explained that categorical exceptions risk "undermin[ing] the warrant requirement by allowing officers to plan to conduct warrantless searches even when they could obtain warrants." *Id.* at 172.

Ultimately, in the context of the automobile exception, the court announced the following rule:

"[I]n order to justify a warrantless seizure or search of a vehicle based on exigent circumstances, the state must prove that exigent circumstances actually existed at the time of the seizure or the search, each of which must be separately analyzed. * * *

"To prove that such an exigency existed, the state must prove that it could not obtain a warrant through reasonable steps, which include utilizing available processes for electronic warrants. Officers cannot create exigent circumstances by [their] own inaction. Similarly, law enforcement agencies and courts cannot create exigent circumstances by failing to take reasonable steps to develop warrant processes that protect against the invasion of the rights of a citizen that results from an unnecessarily cumbersome warrant process."

*Id*. at 177 (internal quotation marks and citations omitted).

## APPLICATION

With the foregoing in mind, we now turn to its application, beginning with Article I, section 9. Defendant argues that *McCarthy* implicitly supplanted *Machuca*, at least in part, and compels reversal in this case:

"*McCarthy* stated explicitly that, in the context of delay for a warrant that could lead to loss of evidence, 'law enforcement agencies and courts cannot create exigent circumstances by failing to take reasonable steps to develop warrant processes that protect against the 'invasion of the rights of a citizen" * * * that results from an unnecessarily cumbersome warrant process. * * *

"* * * * *

> "*McCarthy* indicates that that failure to establish a procedure for telephonic or electronic warrants means that, in this case, the state could not rely on a state-created exigency involving the imminent destruction of evidence because a warrant would take too long to obtain."

We readily acknowledge that *McCarthy*'s holding that "[t]o prove that such an exigency existed, the state must prove that it could not obtain a warrant through reasonable steps," *McCarthy*, 369 Or at 177, is analytically difficult to reconcile with *Machuca*'s holding that "the evanescent nature of a suspect's blood alcohol content is an exigent circumstance that will ordinarily permit a warrantless blood draw * * * [but] particular facts may show, in the rare case, that a warrant could have been obtained and executed significantly faster." *Machuca*, 347 Or at 657. But it is not for us to say that *McCarthy* supplanted *Machuca*. We are an intermediate appellate court, bound by the precedent of the Supreme Court. The court in *McCarthy* did not disavow *Machuca*, and in fact cites it at one point. Further, concluding that *McCarthy* altered the *Machuca* analysis would be, in essence, our resurrection of *Moylett*'s reasoning that, in considering exigency for blood draws, "[t]he state was still required to prove * * * that it could not have obtained a search warrant without sacrificing the evidence[.]" 313 Or at 551. But that reasoning was explicitly disavowed in *Machuca*.

Whatever resolution can be made of *Moylett*, *Machuca*, and *McCarthy* is a task beyond this court. We are compelled to follow *Machuca*, and the facts of this case are difficult to differentiate from that precedent. Accordingly, under *Machuca*, we cannot conclude that the trial court erred in ruling that the warrantless blood draw here was constitutional under Article I, section 9, and therefore properly denied defendant's motion to suppress.

Turning to the Fourth Amendment, in its briefing, the state acknowledges that that Josephine County's lack of electronic warrant procedures is "particularly relevant to the Fourth Amendment analysis under *Missouri v. McNeely*." However, argues the state,

> "After the suppression hearing in this case, the Court decided *Mitchell v. Wisconsin*, 588 US ___, 139 S Ct 2525, 2531, 204 L Ed 2d 1040 (2019), which makes clear that the exigency exception applies in situations such as this where a crash has occurred and the defendant has been transported to the hospital. Thus, even if Oregon courts were to adopt an analysis more similar to the Court's approach in *McNeely* (to the extent that it differs from *Machuca*) the exigency exception applied here."

We do not read *Mitchell* as does the state.

First, the state's argument is a resurrection of the *per se* exigency rationale that existed in the circuit split post-*Schmerber*. In *McNeely*, the Court was explicit in rejecting any *per se* analysis in Fourth Amendment exigency. Second, in *Mitchell*, the court carefully noted that it was addressing a very narrow question and leaving others open.

> "Nor do we settle whether the exigent-circumstances exception covers the specific facts of this case. Instead, we address how the exception bears on the category of cases encompassed by the question on which we granted certiorari—those involving *unconscious* drivers."

*Mitchell*, 139 S Ct at 2534-35 (emphasis added). In *Mitchell*, the Court was solely concerned with the state's warrantless blood draw on an unconscious driver where other less intrusive means, such as a breathalyzer, were unavailable, and consent could not be obtained. This case does not involve a warrantless blood draw from an unconscious driver. The record reflects that defendant was conscious and refused the blood draw at the time the blood draw was performed. The general applicability of *McNeely*, and the totality of the circumstances approach it articulated, is undisturbed by the Court's holding in *Mitchell*. And nothing in *Mitchell* suggests that *McNeely* doesn't apply when the state is faced with a conscious suspect, merely because a traffic accident occurred.

Accordingly, we are called upon to consider what, if any, evidence the state brought forward to carry its burden to establish exigency under the specific facts of this case, and we do so by evaluating that evidence beginning with the five nonexhaustive *McNeely* factors: (1) the availability

of a magistrate; (2) the need for police to attend to and investigate a car accident; (3) technology that enables police to secure warrants quickly; (4) the procedures for obtaining a warrant; and (5) other practical problems that prevent law enforcement from obtaining a warrant within a timeframe that still preserves the evidence. 569 US at 155-56, 164.

First, since 1973, the Oregon legislature has permitted the use of telephonic and electronic technologies that expedite the warrant application process. *See* ORS 133.545 (7), (8)(a). Those statutes have been regularly updated, further facilitating the ease of obtaining remote warrants. As the Oregon Supreme Court noted, "it is possible for warrant applications to be readily prepared and reviewed from separate locations and, if probable cause exists, for warrants to be quickly issued." *McCarthy*, 369 Or at 176.

Second, the officers in this case had the tools and infrastructure available to them to utilize the legislatively authorized remote warrant process. The officers had multiple police vehicles onsite, all with onboard computers, radios, and phones. The state offered no testimony that would indicate the equipment was inoperable, nor that there were problems with cellphone connections or data transmission.

Third, we know from this record that judicial officers were available in Josephine County to issue warrants remotely. The state offered no testimony that they were unable to contact a judicial officer.

Fourth, there was a vehicular accident to attend to, and that clearly weighs in favor of exigency. However, that aspect of the encounter is not dispositive, and we are cognizant that there were at least three officers present on the scene, as well as fire and medical personnel, and two tow trucks. The state presented no evidence that management of the accident scene required the undivided attention of all officers present at all times. Further, as noted in *McNeely*, the articulation of probable cause in preparing a warrant affidavit in "contexts like drunk-driving investigations * * * is simple." 569 US at 142. As an example, here, probable cause in support of a potential warrant could be articulated in three sentences:

- Based on a tip from the suspect's wife that he 'was at a *** bar, [and] drives intoxicated on a regular basis', I parked my patrol car and observed defendant leave the bar and get into his vehicle.

- The suspect attempted to flee from me, and his vehicle eventually crashed.

- Upon extricating the suspect from the accident, responding medical personnel smelled the strong odor of alcohol on the suspect.

The state presented no evidence of why, under the specific facts that comprise the totality of circumstances of this case, preparing a warrant application was incompatible with management of the accident scene. In noting this, we do not suggest that it is always possible to pursue a warrant while attending to an accident—far from it. We can readily imagine a situation where safety demands that officers direct their time and attention to other matters. But we cannot infer this from silence. *McNeely* places the burden on the state to establish exigency; exigency is not a given. Here, the record fails to establish it.

Finally, and most critically, we note that on this record, and largely uncontested by the state, Josephine County police officers at the time of this stop were operating as if there was a *per se* exigency rule for warrantless blood draws, well after *McNeely* had established that there was not. The record is replete with testimony that the same officers, when operating in Jackson County, would apply for a warrant, but in Josephine County they would categorically forgo a warrant and rely solely on dissipation exigency to perform a warrantless blood draw. With over 40 years of combined experience in Josephine County, the three officers testified that, while on patrol in Josephine County, none of them had *ever* applied for a search warrant to obtain a blood draw following a refusal. In accord with that practice, on the night of the arrest at issue here, despite the fact that numerous officers were on the scene and available, the officers did not even discuss applying for a search warrant. In short, at the time of this stop, when it came to DUII investigations in Josephine County, rather than exigency arising in the

regular course of business, *exigency was the regular course of business*.

We are mindful of the challenges that remote warrants can place on rural Oregon counties with limited resources. Some Oregon counties share a single judicial officer who covers multiple counties and vast geographic areas. We do not foreclose the possibility that a record could establish that the resource constraints of a county prevented seeking a telephonic warrant, but such a record needs to be made in the first instance for us to say that the state has carried its burden.

The Fourth Amendment, as the Court articulated its requirements in *McNeely*, requires the state to establish, under a totality of the circumstances approach, specific facts establishing exigency. Here, the totality of the circumstances does not support the existence of an exigency on this record. Accordingly, the warrantless seizure of defendant's blood was a violation of the Fourth and Fourteenth Amendments to the United States Constitution, and the trial court erred in failing to suppress the evidence.

Reversed and remanded.

**LAGESEN, C. J.,** concurring.

I concur in the majority opinion in full. I write separately to highlight the problematic nature of the state's request that the court ratify a warrantless blood draw as reasonable on the grounds of exigency under the circumstances present here, where the officers in the field made no affirmative judgment about whether exigencies excused obtaining a warrant because they adhered to an unconstitutional practice of not seeking warrants for blood draws in drunk-driving cases.

The Fourth Amendment states "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." The provision, by its terms, is a prohibition, a preventative measure. The goal is not after-the-fact enforcement by the courts through a remedial scheme of suppression of evidence. The goal is policing that accords with

constitutional constraints so that the people are, in fact, "secure in their persons, houses, papers, and effects." The only way the Fourth Amendment can perform its intended function is if officers in the field are aware of its constraints, and consciously make decisions to search and seize in accordance with those known constraints.

Of course, some decisions in the field must be made quickly, without time to think through what the Fourth Amendment requires. The decision to order a blood draw is not one of them. Officers can't search blood on their own. They must find a doctor or phlebotomist, usually at a hospital or medical facility, and ask for a blood draw. ORS 813.160(2) ("[O]nly a duly licensed physician or a person acting under the direction or control of a duly licensed physician may withdraw blood or pierce human tissue."). Because blood draws take time, officers can take time to consider the Fourth Amendment. In particular, officers have time to think about whether particular exigent circumstances, beyond the dissipation of alcohol, justify foregoing the warrant required by default under *Missouri v. McNeely*, 569 US 141, 133 S Ct 1552, 185 L Ed 2d 696 (2013).[1] In drunk-driving cases where *McNeely*'s warrant-preference rule applies, if and only if officers take time to make a considered judgment whether exigencies permit a departure from it, should a subsequent court then entertain an argument that officers reasonably determined that they were excused from seeking a warrant. Any other approach would dilute the preventative force of the Fourth Amendment, leaving the people with mere remedies for unconstitutional policing rather than the intended protection from it.

Here, no one in the field made a considered judgment that exigencies justified a departure from *McNeely*'s

---

[1] *Mitchell v. Wisconsin*, 588 US ___, 139 S Ct 2525, 2531, 204 L Ed 2d 1040 (2019), establishes a different rule for blood draws from a driver in a drunk-driving case who is unconscious: "[W]hen a driver is unconscious, the general rule is that a warrant is not needed." Although the state typically bears the burden of proving that an exception to the warrant requirement applies, *Mitchell* appears to have altered that rule in the case of unconscious drivers, establishing a default rule allowing for a warrantless blood draw, but permitting a defendant "to show that his blood would not have been drawn if police had not been seeking BAC information, and that police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties." *Id*. at ___, 139 S Ct at 2539.

default requirement of a warrant.[2] On the contrary, in this case, all officers appear to have been following the prevailing practice in Josephine County at the time, under which the dissipation of alcohol was treated as a *per se* exigency that permitted a warrantless blood draw in any drunk-driving case. As the majority opinion explains, that practice is squarely unconstitutional under *McNeely*. And, as a result of it, there is no indication that any officer considered seeking a warrant, let alone determined that exigencies allowed for a departure from *McNeely*'s default rule. Under those circumstances, it is not the role of the court, after the fact, to determine whether a warrantless blood draw might have been reasonable, had officers been aware of *McNeely*'s constitutional rule and made a conscious judgment about what it required of them.

**KAMINS, J.,** dissenting.

Josephine County's perplexing decision to consider dissipating blood alcohol content (BAC) a *per se* exigency excusing its officers from following the warrant requirement

---

[2] The dissenting opinion suggests that it is irrelevant for purposes of the Fourth Amendment whether the officers in the field made a conscious judgment that exigencies—apart from the dissipation of alcohol—permitted a departure from *McNeely*'s warrant-preference rule. 320 Or App at 367-68 (Kamins, J., dissenting). But where the Court has declined to adopt a *per se* exigency rule, it has indicated that the Fourth Amendment requires an officer to make an on-the-ground assessment whether the particular circumstances allow the officer to forego seeking a warrant. For example, in *Lange v. California*, 594 US ___, 141 S Ct 2011, 2024, 210 L Ed 2d 486 (2021), the Court recently rejected a request to hold that the pursuit of a fleeing misdemeanant was a *per se* exigency allowing for a warrantless entry into a home. In so doing, the Court held:

"The flight of a suspected misdemeanant does not always justify a warrantless entry into a home. *An officer must consider all the circumstances in a pursuit case to determine whether there is a law enforcement emergency.* On many occasions, the officer will have good reason to enter—to prevent imminent harms of violence, destruction of evidence, or escape from the home. But when the officer has time to get a warrant, he must do so—even though the misdemeanant fled."

*Id*. (emphasis added); *see id*. at 2028 (Roberts, C. J., concurring) (interpreting the Court's majority opinion to adopt a rule that

"requires that the officer: (1) stop and consider whether the suspect—if apprehended—would be charged with a misdemeanor or a felony, and (2) tally up other 'exigencies' that *might* be present or arise * * *, before (3) deciding whether he can complete the arrest or must instead seek a warrant—one that, in all likelihood, will not arrive for hours."

(Emphasis in original.)).

has likely caused many situations that run afoul of the Fourth Amendment. This, however, is not one of them.

At around 9:45 p.m., on a curvy rural road with no shoulder, defendant crashed his car while evading police. His speed exceeded 70 mph when he struck an embankment and flipped his car over, coming to a stop upside down in a ditch. Defendant was pinned inside the car and five to 10 emergency personnel and volunteers extricated him over the course of 30 to 40 minutes. During that time, the officer on the scene, who was later joined by two additional officers, was occupied with closing the road, redirecting traffic, and investigating the scene. After emergency personnel extricated defendant from his car, he was placed in an ambulance and taken to the hospital, a 10 to 20-minute drive, for immediate medical attention. At 11:04 p.m., almost one hour and 20 minutes after the car accident, a blood draw was administered. Because those circumstances amount to textbook exigency under decades of United States Supreme Court Fourth Amendment jurisprudence, I would affirm the conviction under both the Fourth Amendment to the United States Constitution and Article I, section 9, of the Oregon Constitution.

Sixty years ago, the United States Supreme Court—in a remarkably similar case—concluded that dissipating blood alcohol content, when combined with a serious accident requiring officer focus and time, amounts to an exigency: "We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant." *Schmerber v. California*, 384 US 757, 770-71, 86 S Ct 1826, 16 L Ed 2d 908 (1966). The court reasoned that, because the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence," exigent circumstances existed. *Id.* at 770 (internal quotation marks omitted). The Supreme Court continued to cite *Schmerber* with approval in each recent case clarifying the analysis

under the Fourth Amendment. *See Mitchell v. Wisconsin*, 588 US ___, 139 S Ct 2525, 2537-38, 204 L Ed 2d 1040 (2019) (analogizing the facts of the case before it to those in *Schmerber* when assessing whether there were exigent circumstances); *Missouri v. McNeely*, 569 US 141, 150-51, 133 S Ct 1552, 185 L Ed 2d 696 (2013) (reasoning that the facts in *Schmerber* made the warrantless blood draw reasonable).

The evolution of Supreme Court jurisprudence since *Schmerber* has only solidified that the circumstances present in both this case and *Schmerber* amount to an exigency. As the majority observes, the question post-*Schmerber* was whether dissipating BAC is itself a *per se* exigency, or whether more was needed to establish exigency, such as a car accident.[1] Under the current analysis, "exigency exists when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application." *Mitchell*, 139 S Ct at 2537. The question before the court in *Mitchell*, the most recent Supreme Court case to address this topic, was whether the sole fact that the driver was unconscious—without any of the pressing needs created by an accident—could itself be that "other factor" such that it combines with dissipating BAC to create an automatic exigency. *Id.* at 2531. Relying on *Schmerber* and analogizing to the situation of a car accident, the court answered that question in the affirmative: "In *Schmerber*, the extra factor giving rise to urgent needs that would only add to the delay caused by a warrant application was a car accident; here it is the driver's unconsciousness." *Id.* at 2537; *see also id.*

---

[1] The majority posits that, after *Schmerber*, courts "split on whether exigency was judged under a totality analysis, or whether the involvement of intoxicated driving, or an accompanying accident, created a type of *per se* exigency in all instances." 320 Or App at 351. The split, however, was about whether dissipating BAC amounts to a *per se* exigency—none of the cases the majority cites addressed whether an "accompanying accident" amounts to a *per se* exigency. Indeed, both the cases the majority cites which rejected a *per se* analysis concluded that the accident involved created exigent circumstances. *State v. Rodriguez*, 2007 UT 15, 54-59, 156 P3d 771, 781 (2007) (concluding that the severity of the car accident objectively demonstrated exigent circumstances and rejecting the assertion that the "officers' belief that warrantless blood extractions were routine dooms the State's quest for exigency" because the officer's subjective assessment is largely irrelevant); *State v. Johnson*, 744 NW2d 340, 344 (Iowa 2008) (concluding that the same time-based considerations present in *Schmerber* were present in the case before it given the circumstances of the accident).

at 2551 (Sotomayor, J., dissenting) (describing the *Mitchell* decision as "permit[ting] officers to order a blood draw of an unconscious person in all but the rarest cases, even when there is ample time to obtain a warrant").

In reaching that conclusion, the *Mitchell* majority observed that many of the facts associated with an accident will also be present when a driver is found unconscious (most of which are present in the case before us). *See id.* at 2537-38 (facts justifying exigency include "that the suspect will have to be rushed to the hospital or similar facility not just for the blood test itself but for urgent medical care" and "might require monitoring, positioning, and support on the way to the hospital," "that his blood may be drawn anyway, for diagnostic purposes, immediately on arrival," and "that immediate medical treatment could delay (or otherwise distort the results of) a blood draw conducted later, upon receipt of a warrant, thus reducing its evidentiary value"). Particularly relevant here, a consideration driving the court's decision was the risk that an unconscious driver *might cause a car accident*—the classic "extra factor" found in *Schmerber*.

> "Indeed, in many unconscious-driver cases, the exigency will be *more* acute[.] *** A driver so drunk as to lose consciousness is quite likely to crash, especially if he passes out before managing to park. And then the accident might give officers a slew of urgent tasks beyond that of securing (and working around) medical care for the suspect. Police may have to ensure that others who are injured receive prompt medical attention; they may have to provide first aid themselves until medical personnel arrive at the scene. In some cases, they may have to deal with fatalities. They may have to preserve evidence at the scene and block or redirect traffic to prevent further accidents. These pressing matters, too, would require responsible officers to put off applying for a warrant, and that would only exacerbate the delay—and imprecision—of any subsequent BAC test."

*Id*. at 2538 (emphasis in original). The court thus concluded, "Just as the ramifications of a car accident pushed *Schmerber* over the line into exigency, so does the condition of an unconscious driver bring his blood draw under the exception. In such a case, as in *Schmerber*, an officer could reasonably have believed that he was confronted with an

emergency." *Id*. (internal quotation marks omitted). To put it simply, deciding between pressing public safety needs and pursuing a warrant "is just the kind of scenario for which the exigency rule was born—just the kind of grim dilemma it lives to dissolve." *Id*.

Here, as in *Schmerber* and extensively discussed in *Mitchell* as the prototypical "other factor," we actually have a serious car accident. There is no need to speculate as to whether the fears identified in *Mitchell* will play out—will officers need to preserve evidence? Will the defendant need to be taken to the hospital? Will the scene need to be investigated? Will defendant's injuries require immediate medical treatment that may make it difficult to conduct the blood draw at a later time? The answer to all those questions is yes. In the one hour and 20 minutes between when the accident occurred and the blood draw, officers were appropriately occupied with those pressing matters. The officers were faced with the choice "between prioritizing a warrant application, to the detriment of critical health and safety needs, and delaying the warrant application, and thus the BAC test, to the detriment of its evidentiary value and all the compelling interests served by BAC limits." *Mitchell*, 139 S Ct at 2538. For purposes of Fourth Amendment jurisprudence, the officers chose correctly.

The majority acknowledges that a vehicular accident "weighs in favor of exigency" but observes that "[t]he state presented no evidence of why, under the specific facts that comprise the totality of circumstances of this case, preparing a warrant application was incompatible with management of the accident scene." 320 Or App at 358. However, the state did present evidence of the many pressing needs officers were addressing, evidence similar to that considered in both *Schmerber* and *Mitchell*. Specifically, the initial officer who was by herself "for what felt like a long period of time" had to break through a car window so she could communicate with defendant, set up traffic flares, correspond with other units, and regulate traffic, all while running back and forth to check on defendant's well-being. Over the course of the hour, two additional officers arrived. While defendant was being extricated, the officers were focused

on investigating what they believed was a possible fatality, preserving roadway evidence, and redirecting traffic. After defendant was extricated, two officers took five to 10 minutes to go to defendant's house in an effort to deliver, in person, the news to his wife of the severity of defendant's condition. Contrary to the majority's contention, the record is replete with evidence of the pressing needs to which officers were attending. A requirement of a showing of precisely how those efforts were "incompatible" with applying for a warrant is itself incompatible with the decision in *Mitchell*.

Finally, the majority considers critical in the analysis that Josephine County has refused to adopt a remote warrant process and officers "were operating as if there was a *per se* exigency rule." 320 Or App at 358. I understand the majority's reaction to the county's puzzling rejection of such a process, particularly when that rejection, at least under the majority's decision, jeopardizes every single conviction that stems from a search conducted under exigent circumstances. I disagree, however, that the failure to adopt such a process compels the result here.

The testimony in the record indicates that it takes close to two hours to obtain a warrant—even a telephonic warrant in the counties that facilitate them. The majority's belief that the warrant application would be comprised of a few quick sentences transmitted from patrol cars at the scene readily equipped to send them, and that a judge would be readily available to sign off on that application, is a goal to which every county should aspire. It is not, however, a reality supported by this record. 320 Or App at 356-58.[2]

---

[2] The majority cites *McNeely* for the proposition that blood draw warrant applications are "simple." 320 Or App at 357. However, *McNeely* also recognized that, although the availability of electronic warrants may speed up the process, the process still can be more time-consuming than the situation envisioned by the majority:

"We by no means claim that telecommunications innovations have, will, or should eliminate all delay from the warrant-application process. Warrants inevitably take some time for police officers or prosecutors to complete and for magistrate judges to review. Telephonic and electronic warrants may still require officers to follow time-consuming formalities designed to create an adequate record[.] *** And improvements in communications technology do not guarantee that a magistrate judge will be available when an officer needs a warrant after making a late-night arrest."

*McNeely*, 569 US at 155.

Remote warrants are quicker than traditional warrants, but they are not instantaneous. And, once again, *Mitchell* addresses this very question: "[W]ith better technology, the time required [to obtain a warrant] has shrunk, but it has not disappeared. In the emergency scenarios created by unconscious drivers, forcing police to put off other tasks for even a relatively short period of time may have terrible collateral costs. That is just what it means for these situations to *be* emergencies." *Mitchell*, 139 S Ct at 2539 (emphasis in original).

The majority opinion essentially relies on the premise, flowing from *McNeely*, that the Fourth Amendment requires that "[u]nless there is too little time to do so, police officers must get a warrant before ordering a blood draw." *Mitchell*, 139 S Ct at 2544-45 (Sotomayor, J., dissenting). However, as the *Mitchell* dissent laments, *Mitchell*'s two-requirement approach represents a departure from that premise. *Id.* at 2550. In any event, the record here supports the finding that a reasonable officer would, in fact, believe that there was not enough time to secure a warrant. *See State v. Ritz*, 361 Or 781, 795, 399 P3d 421 (2017) (reasoning that the state must establish that the "officers reasonably believed that the delay caused by obtaining a warrant would likely lead to the loss of evidence").[3]

The concurrence further observes that "no one in the field made a considered judgment that exigencies justified a departure from *McNeely's* default requirement of a warrant." 320 Or App at 360-61 (Lagesen, C. J., concurring). The Fourth Amendment, however, does not require that an officer identify only legally appropriate reasons—many of which, as recounted above, informed the officers' judgment here—that a situation is exigent for that situation to be, in fact, exigent. An officer's inclusion of an improper consideration—such as the lack of a remote warrant policy—in the exigency calculus does not preclude our duty to

---

[3] We do not need to address the impact of *Mitchell* on the viability of *McNeely*, because the facts here meet either standard. Notably, the *Mitchell* dissent praises the *Schmerber* decision as one in which the facts associated with a car accident, specifically the "delay caused by the investigation at the scene and the subsequent hospital trip" justified an exigent blood draw. *Mitchell*, 139 S Ct at 2544 (Sotomayor, J., dissenting). Those facts are, again, remarkably similar to the ones present in this case.

review the totality of the circumstances of a case to determine whether exigency exists. *See Lange v. California*, ___ US ___, 141 S Ct 2011, 2018, 210 L Ed 2d 486 (2021) ("The [exigent-circumstances] exception requires a court to examine whether an emergency justified a warrantless search in each particular case." (Internal quotation marks omitted.)). Indeed, the "subjective motivation" of the officer is "irrelevant." *Brigham City, Utah v. Stuart,* 547 US 398, 404, 126 S Ct 1943, 164 L Ed 2d 650 (2006) ("An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify the action." (Emphasis in original; internal quotation marks and brackets omitted.)); *see also Kentucky v. King*, 563 US 452, 464, 131 S Ct 1849, 179 L Ed 2d 865 (2011) ("[W]e have never held, outside limited contexts such as an inventory search or administrative inspection *** that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment." (Internal quotation marks omitted.)).

Moreover, as the three opinions in this case demonstrate, the question of how much *Mitchell* displaced *McNeely's* "default requirement" of a warrant in exigent circumstances is something about which reasonable jurists can differ. 320 Or App at 360-61 (Lagesen, C. J., concurring). A police officer in the field at the scene of a potentially fatal car accident is not required to reflect upon those nuances. Rather, under *Mitchell*, the officer is charged with tending to the pressing needs that take priority over obtaining a warrant. And, to conduct an exigent search, the officer must "'reasonably have believed that he was confronted with an emergency.'" *Mitchell*, 139 S Ct at 2538 (quoting *Schmerber*, 384 US at 770).

There is no dispute that the officers reasonably believed that they were confronted with an emergency and that that emergency met the two requirements identified in *Mitchell*: (1) defendant's BAC was dissipating and (2) other pressing needs were present that would take priority over a warrant application. *Id*. at 2537. As defendant's challenge arises under the Fourth Amendment, Supreme Court precedent compels us to conclude that those circumstances created an exigency that justified an exception to the warrant requirement. I would affirm the conviction.